**UNITED STATES of America, Appellee,**

v.

**Carlos VILLEGAS and Fernando Gonzalez, Defendants–Appellants.**

**Nos. 23, 24, Dockets 90–1130, 90–1131.**

United States Court of Appeals,
Second Circuit.

Argued Oct. 3, 1990.

Decided March 12, 1991.

Paul P. Rinaldo, Forest Hills, N.Y., for defendant-appellant Gonzalez.

William Mogulescu, New York City (Levinson, Mogulescu & Kaplan, New York City, of counsel), for defendant-appellant Villegas.

Eric Friedberg, Asst. U.S. Atty. E.D. New York (Andrew J. Maloney, U.S. Atty. E.D. of New York, Emily Berger, Asst. U.S. Atty., New York City, of counsel), for appellee.

Before CARDAMONE and MINER, Circuit Judges, and POLLACK, District Judge.*

* Honorable Milton Pollack, Senior Judge, United States District Court for the Southern District of New York, sitting by designation.

MINER, Circuit Judge.

Defendants–Appellants Carlos Villegas and Fernando Gonzalez appeal from judgments of conviction entered against them on February 2, 1990, upon conditional pleas of guilty, in the United States District Court for the Eastern District of New York (Weinstein, *J.*). Both defendants were convicted of possessing cocaine with intent to distribute it, in violation of 21 U.S.C. § 841(a). Judge Weinstein sentenced Villegas to a term of imprisonment of 63 months to be followed by a five-year term of supervised release, a $30,000 fine and a special assessment of $50. He sentenced Gonzalez to a term of imprisonment of 60 months to be followed by a five-year term of supervised release, a $30,000 fine and a special assessment of $50. By their conditional pleas, Villegas and Gonzalez reserved for review the rulings by the district court denying, after hearing, their motions to suppress. The motions challenged an investigative stop, a search and seizure and statements made to government agents.

Villegas and Gonzalez both claim that the district court erred in finding that the investigative stop by agents of the Drug Enforcement Administration was supported by reasonable suspicion. Villegas further contends that the district court erred in finding that he consented to a search of his shoulder bag and the two shoe boxes (one containing a pound of marijuana and one containing a kilogram of cocaine) found inside the bag. He asserts also that his statement to the agents should be suppressed as "fruit of the poisonous tree." Gonzalez contends that the district court erred in finding that he knowingly and intelligently waived his *Miranda* rights, which purportedly were read to him by his co-defendant, Villegas.

For the reasons that follow, we reject all the claims of error put forward by Villegas and Gonzalez and affirm the judgments of conviction.

## BACKGROUND

Commencing in late December, 1988, Special Agents Barton and Conneely of the Drug Enforcement Administration ("DEA"), along with other DEA agents, maintained a surveillance of a suspected stash pad at 209–52 45th Drive in the Borough of Queens, New York City. A blanket covered the front window of the premises, little or no mail was delivered there, and electricity in the house apparently was acquired illegally. In early January, 1989, numerous persons were observed entering and leaving the premises at all hours, carrying large packages. During the same period, a convicted cocaine dealer was observed at the premises, and a search of trash discarded from the house revealed marijuana as well as what appeared to be money records and money wrappers.

On January 6, 1989, four days before a warrant to search the suspected stash pad was issued, defendant-appellant Gonzalez drove up to the premises in a mini-van owned by one Adriana Munoz. DEA computer files, checked soon after the van was spotted, revealed that Munoz was listed as a member of a cocaine distribution network based in Miami, Florida. Gonzalez appeared at the 45th Drive location only on one occasion after his January 6 visit there. On January 6, Gonzalez entered the house and remained there for about fifteen minutes. He next drove to 49–89 175th Place in Queens and entered the house at that location.

The DEA then took up surveillance of the 175th Place premises. That surveillance led Agent Conneely to follow Gonzalez on January 12, 1989 when Gonzalez, accompanied by an unknown woman, drove the van from 175th Place to Washington Heights in Manhattan. A large brown shopping bag was observed in the car. Along the way, Gonzalez stopped to make a telephone call at a gas station on Grand Central Parkway. Agent Conneely stopped his vehicle on the shoulder of the exit ramp leading from the gas station. Gonzalez slowly drove past Conneely's car and then sped up the Parkway and the Harlem River Drive at very high speeds. When Gonzalez

arrived at 190th Street and St. Nicholas Avenue, he drove toward a parking spot, where he leaned out of the van window and talked to a man on the corner for about thirty seconds. He then drove slowly around the block a second time, ultimately arriving at the same parking spot he had approached previously. Gonzalez and the woman brought the package into one of the buildings, but nothing further was observed on that occasion.

Continuing their surveillance of the 175th Place house, the DEA agents, on January 18, 1989 at about 3:00 P.M., observed Gonzalez, Villegas, a woman and two children depart from that location in the van. After dropping off the children and stopping at a drugstore, the remaining occupants of the van proceeded to 160th Street and Metcalf Avenue. After circling around the block and doubling back, the van came to a stop. Gonzalez and the woman left the van and entered a house, where they remained for about ten minutes before re-entering the vehicle. As observed by the agent following it, the van then proceeded to 158th Street and Northern Boulevard, where it circled around the block and doubled back, in a maneuver similar to the previous one, before stopping.

Gonzalez and Villegas then met with two men on the street. One of the men, who was wearing a long black jacket with white lettering on the back, spoke on the telephone located on the corner while Gonzalez and the other man waited. Meanwhile, Villegas walked half-way down the block to another telephone, holding a beeper in his hand. He there was observed making a series of what appeared to be beeper calls before walking back up the block for a brief meeting with Gonzalez and the two men. Villegas and Gonzalez then departed in the van, and the other two men left in a gray Caprice automobile. Agent Barton, who was maintaining surveillance from across the street, made a U-turn in his automobile in an attempt to follow the van. His turn apparently came too late, and he lost sight of the vehicle. Upon his return to the 175th Place house, Agent Barton

observed Gonzalez and Villegas walking from the parked van to the back door of the residence.

Later that evening, the unidentified man in the long black coat who had been involved in the meeting earlier that day arrived at the 175th Place house in the gray Caprice. He entered the house and departed in very short order. About a half-hour later, a livery cab arrived at 175th Place and picked up Villegas and Gonzalez. Villegas was carrying a shoulder bag. They left the cab at the subway station at Main Street and Kissena Boulevard in Queens and proceeded into the station. Agent Barton, accompanied by Agents Haff and Falvey, followed. According to Barton's testimony at the suppression hearing, Gonzalez was observed speaking on the telephone in the station, holding a beeper in his hand. Villegas then took the telephone from Gonzalez, spoke into it for a while and then handed it back to Gonzalez, who finished the call. Villegas then made another call after looking at his beeper.

Agents Barton and Falvey then approached. Agent Barton testified that he intended ultimately to search the bag carried by Villegas, either by consent or by obtaining a search warrant. Barton identified himself as an officer and asked Villegas what was in the bag. According to Barton, Villegas handed him the bag and told him to look for himself. Barton unzipped the bag, saw two small shoe boxes inside and took out one of the boxes. He asked Villegas what was in the box, and the response was "personal things like deodorant and soap." Barton twice asked, and twice was granted, permission to open the box. He opened it and recovered a pound of marijuana, whereupon he handcuffed Villegas and then opened the second box, which contained a kilogram of cocaine. Gonzalez also was arrested when the drugs were found.

Outside the subway station, Agent Haff advised Villegas, in English, of his *Miranda* rights. Villegas, who is fluent in Spanish and English, said that he wanted to cooperate and to continue a cooperation agreement previously entered into with the office of the United States Attorney for the Southern District of New York. Both Villegas and Gonzalez were transported back to the 175th Place house, which, the agents learned, belonged to Gonzalez. At the house, Agent Haff read Villegas his *Miranda* rights a second time, in English. Haff attempted to read Gonzalez his *Miranda* rights from a Spanish language card, but Gonzalez appeared not to understand. Villegas then was asked to read the warnings to Gonzalez and agreed to do so. Agent Barton, who had some academic and practical training in Spanish, followed along as Villegas read to Gonzalez. Gonzalez answered "yes" to the questions on the card inquiring whether he understood and whether he wished to answer questions. He then was given the card to read, reviewed it briefly and nodded in the affirmative.

Gonzalez and Villegas then gave detailed responses to the agents' questions, with Villegas translating for Gonzalez. They said they were bringing the cocaine and marijuana to a customer of Villegas in Manhattan, and Gonzalez indicated that he had obtained the drugs from "Edison," the man in the long black coat observed during the surveillance. In an apparent effort to pursue the investigation, the agents asked Gonzalez to call Edison to come to his house on a false pretext, and Gonzalez agreed. Edison came as requested, but the agents were unable to follow him.

Villegas testified at the suppression hearing, but Gonzalez did not. According to Villegas, the agents "grabbed" him in the subway and one asked him what was in the bag. When he replied that it was "personal stuff," the agent asked whether he could take a look and, without waiting for a response, opened the bag. Villegas testified that the only thing the agent said to him after opening the bag was "look what I found." He said that he never would consent to the search because he knew that the ongoing cooperation agreement he had with the office of the United States Attorney in the Southern District of New York would be jeopardized if the drugs were found. The agreement had been made in connection with a cocaine possession indict-

ment then pending against him in the Southern District. As to assisting in advising Gonzalez of his *Miranda* rights, Villegas testified that he did not read the Spanish language card to Gonzalez, that he never saw the card, and that he could not have read the card in any event, due to poor vision. Although Gonzalez did not testify, his affidavit in support of the suppression motion included an allegation that he had not received his *Miranda* rights.

The district court found that the agents' initial stop of Villegas and Gonzalez was a valid investigative stop with an "ample basis." The court also found that the search of the shoulder bag was a consent search, because Villegas "readily" gave permission to examine the bag. Finally, the court determined that Gonzalez was fully informed of his *Miranda* rights. A motion to reconsider, based on the argument that Agent Barton had lied when he testified that Villegas read the *Miranda* card was rejected. Although statements of eye doctors to the effect that Villegas was unable to read without a magnifying glass were submitted in support of the motion, the court adhered to its determination to credit the testimony of Agent Barton on the *Miranda* issue.

## DISCUSSION

A government law enforcement agent may subject an individual to an investigative stop upon a reasonable suspicion that the individual is, has been, or is about to be engaged in criminal activity. *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The agent is said to have a reasonable suspicion when he is in possession of "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion." *Id.* at 21, 88 S.Ct. at 1879 (footnote omitted); *see United States v. Sharpe,* 470 U.S. 675, 682, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985). The level of suspicion for a so-called *Terry* stop "is considerably less than proof of wrongdoing by a preponderance of the evidence," and the totality of the circumstances must be considered when the validity of the stop is evaluated. *United States v. Sokolow,* 490 U.S. 1, 7–8, 109 S.Ct. 1581, 1585–86, 104 L.Ed.2d 1 (1989). In the case of narcotics trafficking, an agent's suspicion is held to be reasonable "if the conduct as a whole would appear suspect to one familiar with the practices of narcotics couriers, albeit the pattern of behavior is innocuous to the untrained observer." *United States v. Ramirez–Cifuentes,* 682 F.2d 337, 342 (2d Cir. 1982). Conduct as consistent with innocence as with guilt may form the basis for an investigative stop where there is some indication of possible illicit activity. *Id.*

Applying the foregoing rules, the district court properly identified a number of specific facts supporting its determination that the agents had ample basis to stop Gonzalez and make inquiries of him: the agents' observation of Gonzalez at a location where there was substantial evidence of drug dealing, as evidenced by the issuance of a search warrant for the premises; Gonzalez' presence in a van connected with somebody engaged in drug trafficking; his driving in a way that indicated a desire to evade surveillance; the use of beepers; and his general attitude and actions. Beepers are recognized as a standard tool of the drug trafficking trade. *See United States v. Guerra,* 888 F.2d 247, 251 (2d Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 1833, 108 L.Ed.2d 961 (1990). As to Villegas, the district court noted that he came under suspicion because of the nature of his association with Gonzalez. The court further noted that Villegas' acquisition of the shoulder bag "and the method of acquisition in the context of all of this background and his accompanying Gonzalez understandably heightened the suspicion of the agents." The district court enumerated various pertinent factors supporting its determination that the investigative stop in the subway was appropriate: the nature of the subway system; the conditions at the subway station at the time; the substantial possibility that Villegas and Gonzalez would be lost or that people might be endangered if no action was taken; and the possibility that weapons might be involved.

■ The factual findings of a district court on a motion to suppress cannot be disturbed unless shown to be clearly erroneous. *See United States v. Benevento,* 836 F.2d 60, 67 (2d Cir.1987), *cert. denied,* 486 U.S. 1043, 108 S.Ct. 2035, 100 L.Ed.2d 620 (1988). The clearly erroneous standard applies to a finding grounded on an assessment of credibility. *See United States v. Zapata–Tamallo,* 833 F.2d 25, 27 (2d Cir. 1987) (per curiam). Upon review of the denial of a motion to suppress, the evidence must be viewed in the light most favorable to the government. *United States v. Jackson,* 652 F.2d 244, 246 (2d Cir.), *cert. denied,* 454 U.S. 1057, 102 S.Ct. 605, 70 L.Ed.2d 594 (1981). Unless we are left "with a definite and firm conviction that a mistake has been committed," we may not disregard the district court's findings of fact. *United States v. Rios,* 856 F.2d 493, 495 (2d Cir.1988) (per curiam). All the factual determinations made in this case are supported by evidence in the record. Taken in total, and placed in the perspective of a "whole picture," *United States v. Cortez,* 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981), that evidence is more than sufficient to justify the conclusion that the investigative stop of Villegas and Gonzalez was properly grounded and properly executed.

■ Villegas argues on appeal that there was no reasonable basis to believe he was involved in criminal activity because the agents never knew he existed before the day he was arrested and because his activities all were consistent with lawful conduct. While it is true that the DEA agents were not aware of the existence of Villegas until the day he was arrested, his actions while accompanying Gonzalez gave reason to suspect that he too was involved in the type of narcotics activity taking place at the 45th Drive house. An experienced narcotics investigator could conclude that Villegas' activities were part of a drug transaction that was set up at the meeting on Northern Boulevard and carried out when the man in the long black coat brought to 175th Place the narcotics that appellants were about to deliver when they were stopped in the subway. The agents had more than the requisite "minimal level of objective justification." *INS v. Delgado,* 466 U.S. 210, 217, 104 S.Ct. 1758, 1763, 80 L.Ed.2d 247 (1984).

■ Although Gonzalez asserts in his brief on appeal "that the acts of Gonzalez up until his arrest, as described by the agent, did not rise to the level of reasonable suspicion," the converse is true. Gonzalez bases his argument on the claim that none of his activities, taken in isolation, formed a basis for reasonable suspicion. Even if that were true, which it is not, the "totality of the circumstances" here, *Sokolow,* 490 U.S. at 8, 109 S.Ct. at 1585, compel clear inferences warranting suspicion of criminal activity. *See United States v. Vasquez,* 638 F.2d 507, 520 (2d Cir.1980), *cert. denied,* 454 U.S. 975, 102 S.Ct. 528, 70 L.Ed.2d 396 (1981). The circumstances included two appearances at what probably was a stash pad, the use of a suspected drug dealer's van, the counter-surveillance operation of that van, the use of a beeper, the transportation of packages apparently involved in narcotics transactions, and stealthy movements and activities customarily associated with drug trafficking, at least in the eyes of experienced observers. The execution of the stop as to both Villegas and Gonzalez involved an intrusion no greater than required. *Id.* at 520. The agents were in plainclothes, they kept their weapons concealed, and there was no touching. The agents approached, Barton identified himself as an agent and asked Villegas what was in the bag. Gonzalez, who was standing a short distance away, was confronted by Agent Haff and escorted back to where Villegas was standing.

■ The district court concluded that Agent Barton and not Villegas was telling the truth regarding consent to search the bag. The court based its assessment upon its observation of Villegas and the determination that Villegas was "a highly manipulative and brazen person." The court opined that Villegas, considering the agreement in the Southern District for his cooperation, quickly decided that there was no point in denying access to the bag because

"if there was no substantial basis for holding him, the agent might not search" and if there was a search, he could say "he cooperated fully and he did not know what was in the bag." Alternatively, according to the court, Villegas may have thought that he could "make a deal" of some sort or say that he was working undercover. Referring to the "character and background" of the appellant, the district court found "that he did not resist, but rather agreed readily and consented to the search of the bag and its contents."

"The test of voluntariness is whether the consent was the product of an essentially free and unconstrained choice by its maker ... and is a question of fact to be determined from all of the surrounding circumstances." *United States v. Arango-Correa*, 851 F.2d 54, 57 (2d Cir.1988) (citation omitted). A finding of voluntary consent by the district court will not be set aside unless clearly erroneous. *Id.; see United States v. Lace*, 669 F.2d 46, 52 (2d Cir.), *cert. denied*, 459 U.S. 854, 103 S.Ct. 121, 74 L.Ed.2d 106 (1982). Villegas simply argues on appeal that Agent Barton's testimony was not believable and that his own testimony "was completely credible and consistent with human nature." His testimony was that he was "petrified" when the agents approached and that he never consented to a search. He said that Agent Barton asked if he could "take a look" but never waited for an answer. The district court of course was free to reject that testimony and accept the agent's, and did so. Despite Villegas' estimate of human nature, "it is apparent that suspects can, and often do, voluntarily consent to a search even when it must be clear to them that incriminating evidence will be disclosed." *United States v. Price*, 599 F.2d 494, 503 (2d Cir.1979) (citation omitted). As noted by the district court, there often are well-grounded reasons for such consent.

 Villegas' argument that the consent to search did not extend to the second shoebox is rejected. As determined by the district court, a general consent to search the bag, including its contents, was given

voluntarily. *Cf. United States v. Mendenhall*, 446 U.S. 544, 559, 100 S.Ct. 1870, 1879, 64 L.Ed.2d 497 (1980) (rejecting argument that only inference to be drawn from acting in manner contrary to self-interest is compulsion). By telling the agent to "look for [him]self," Villegas gave up all expectations of privacy with regard to the bag and consented to the search of the bag as well as its contents. Moreover, he gave Agent Barton specific permission to search the first shoebox. Permission to search the entire bag and its contents never was withdrawn. Once a legitimate search of the bag was underway, the agents had the authority to carry it through to its ultimate conclusion. The initial stop and the consent search being lawful, Villegas' attempt to suppress his statement as the fruit of the poisonous tree must be rejected.

 For us, the most difficult question presented here is the claim by Gonzalez that he was not properly afforded his *Miranda* warnings. We first note our strong agreement with the district court's statement that it is undesirable to have a co-defendant read *Miranda* rights. We think that the practice is highly undesirable and caution that, in most circumstances, *Miranda* rights cannot be considered properly given if read by a co-defendant. That said, we believe the manner in which the rights were administered here passes muster, but barely so. The district court found that the agent made a good faith effort to inform Gonzalez of his rights and that "Villegas assisted in informing Gonzalez of his rights, partly by reading from the card,— partly based upon his own knowledge of those rights[,] having been before the Courts and in police custody on other occasions." The district court concluded that "Gonzalez was fully informed of his *Miranda* rights."

 We are constrained to conduct a *de novo* review of whether the waiver of rights by Gonzalez was knowing and voluntary. *United States v. Diaz*, 891 F.2d 1057, 1061 (2d Cir.1989). The government is required to prove waiver by a preponderance of the evidence, *Colorado v. Connelly*, 479 U.S. 157, 167–69, 107 S.Ct. 515,

521–23, 93 L.Ed.2d 473 (1986), and the clearly erroneous standard applies to the assessment of factual issues relating to the waiver, *United States v. Scarpa,* 897 F.2d 63, 68 (2d Cir.1990). We credit the findings of the district court and agree that the government has carried its burden. We are impressed with the fact that Agent Barton, although not fluent in Spanish, was sufficiently conversant with the language so as to be able to closely monitor Villegas' reading to Gonzalez. It is also significant that Gonzalez nodded affirmatively after he was given the card and appeared to read it himself. There is no basis to disturb the district court's credibility findings rejecting the testimony of Villegas that he did not read the warnings to Gonzalez and was unable to do so in any event due to an eye condition.

## CONCLUSION

The judgments of conviction are affirmed in all respects.