UNITED STATES of America, Appellee,

v.

**Ramon CABA and Juan Valdez, Defendants–Appellants.**

**Nos. 148, 521, Dockets 91–1219, 91–1268.**

United States Court of Appeals, Second Circuit.

Argued Dec. 11, 1991.

Decided Jan. 29, 1992.

Abraham L. Clott, The Legal Aid Society, New York City, for defendant-appellant Ramon Caba.

Alan Scribner, Bayonne, N.J. (Larry Bronson, of counsel), for defendant-appellant Juan Valdez.

John T. McCormick, New York City, Asst. U.S. Atty., S.D.N.Y. (Otto G. Obermaier, U.S. Atty., S.D.N.Y., James B. Comey, Asst. U.S. Atty., of counsel), for appellee.

Before FEINBERG, NEWMAN and CARDAMONE, Circuit Judges.

FEINBERG, Circuit Judge:

Ramon Caba and Juan Valdez appeal from judgments of conviction entered after a seven-day jury trial before Dominick L. DiCarlo, J., sitting by designation in the United States District Court for the Southern District of New York, for conspiring to distribute and to possess with the intent to distribute one kilogram or more of heroin. Caba and Valdez were sentenced, respectively, to 151 months and 121 months in prison. Each was also sentenced to five years of supervised release and a mandatory $50 special assessment. Caba claims that the district court erred in denying his motion to suppress his confession. Both Caba and Valdez claim that the court erred in failing to make an independent determination of their capacity to purchase one kilogram or more of heroin and in responding to the jury's questions regarding the quantity of drugs involved in the conspiracy. For the reasons given below, we affirm.

## I. Background

This case involves a "reverse sting" operation in which a government informer pretended to sell non-existent drugs to the defendants. The record before us, much of it made at a suppression hearing before Judge Robert W. Sweet, established the following. When Caba and Valdez were arrested, they were in the process of purchasing heroin from a Drug Enforcement Administration (DEA) confidential informant, Ramon Perez, who was posing as a heroin dealer. After the arrest, DEA agents transported Caba and Valdez to DEA headquarters to be fingerprinted and photographed. Agent Sherman Cecil gave Valdez warnings required by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) by reading them to him from an English card. Since Valdez had no difficulty speaking or understanding English, Agent Cecil needed no assistance in issuing the warnings to him. After indicating that he understood each of his rights and was willing to make a statement, Valdez told Agent Cecil that he had brought approximately $40,000 for the purchase of heroin. Valdez then gave a written statement to Agent Cecil, made corrections in it, initialed the corrections and was subsequently removed from the room.

Caba was then brought to the same room. Although Caba spoke some English, his command of the language was much more limited than Valdez's. In response to this language problem, Agent Cecil's superior tried to find an interpreter. When the superior's efforts were unsuccessful, Agent Cecil asked Ramon Perez to assist in the translation of the Miranda warnings. Perez had been convicted of a narcotics offense a few years before and was awaiting sentence on a second narcotics offense, for which he could receive a lengthy prison term. For obvious reasons, Perez had been cooperating with the government.

Agent Cecil read the warnings in English from a standardized card, pausing after each warning to permit Perez to translate. Caba indicated that he understood each right either by nodding his head affirmatively or by responding "si." Caba then agreed to make a statement and, with Perez interpreting, stated in Spanish that he had brought $50,500, money that belonged to Valdez, to purchase heroin. Caba subsequently agreed to give a written statement and, with Perez interpreting, dictated his statement to Agent Cecil. After reviewing the statement with Perez's assistance, Caba pointed out mistakes in the statement (which Agent Cecil then corrected), initialed the corrections and signed the statement. Perez testified at the suppression hearing that his statements to Caba during the interrogation were accurate translations of the Miranda warnings and that his statements to Agent Cecil were accurate translations of what Caba had said.

The evidence at the suppression hearing demonstrated that during the questioning, neither Caba nor Valdez was handcuffed and neither defendant appeared to be under the influence of alcohol or drugs. The agents made no promises or threats, and neither defendant voiced any complaints about his treatment. Perez also made no promises to either defendant and had no post-arrest conversations with either defendant outside the agents' presence.

At the conclusion of the hearing, Judge Sweet reprimanded the agents for relying upon an interested interpreter in giving the Miranda warnings. He stated that, "the practice of using a confidential informant [as an interpreter] is undesirable and should be done in my view, only if absolutely necessary." He found, however, that the "questioning was accurately translated by the interpreter, by the confidential informant" and "as a matter of law that the defendants voluntarily waived their Miranda rights and that the statements should not be suppressed on that ground."

After a trial before Judge Sweet that ended with a hung jury, the case was reassigned for trial again before Judge DiCarlo. The evidence of defendants' guilt at trial was strong, including taped recordings of Caba's conversations with Perez, statements made by defendants immediately after their arrest, the large amount of cash defendants had brought to the meeting with Perez when arrests were made and

the testimony of Agents Cecil and Perez. One of the principal defenses at trial was entrapment, which the jury obviously rejected.

Before the jury retired to deliberate, the judge explained that in order to find a defendant guilty, the jury needed only to find that the co-conspirators had agreed to distribute, or possess with the intent to distribute, any quantity of heroin, since the amount was not an essential element of the crime. The jury, however, was then instructed to use a special verdict form, which required specification of the quantity of narcotics the jury found each defendant had conspired to possess.

During their deliberations, the jury asked two questions regarding the special verdict, to which the judge responded. The jury subsequently found by special verdict that both defendants conspired with respect to one kilogram or more of heroin.

Prior to sentencing, the probation department prepared a presentence investigation report describing in detail the facts of the offense and concluding that each defendant had conspired to possess with the intent to distribute 1400 grams of heroin, thus setting each defendant's base offense level at 32, pursuant to U.S.S.G. § 2D1.4. At sentencing, Judge DiCarlo asked each defendant and his counsel if they had read the presentence report and if any issues were in dispute. The reply in each case was that the report had been read and that there were no factual issues in dispute. Judge DiCarlo then adopted the findings of the probation department and sentenced the defendants accordingly.

## II. Discussion

*Miranda Warnings.*

 It is well settled that a waiver of Miranda rights is valid only if it is the product of a knowing and voluntary choice. *Colorado v. Spring,* 479 U.S. 564, 573, 107 S.Ct. 851, 856, 93 L.Ed.2d 954 (1987); *United States v. Bye,* 919 F.2d 6, 8–9 (2d Cir. 1990). It is also established that the "question of waiver must be determined on 'the particular facts and circumstances surrounding [each] case.' " *North Carolina*

*v. Butler,* 441 U.S. 369, 374, 99 S.Ct. 1755, 1758, 60 L.Ed.2d 286 (1979) (quoting *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938)).

In determining the validity of a waiver, the district court's subsidiary factual findings must be upheld unless they are clearly erroneous. *United States v. Maldonado-Rivera,* 922 F.2d 934, 972 (2d Cir.1990), cert. denied, — U.S. —, 111 S.Ct. 2811, 115 L.Ed.2d 984 and — U.S. —, 111 S.Ct. 2858, 115 L.Ed.2d 1025, 1026 (1991); *United States v. Diaz,* 891 F.2d 1057, 1060–61 (2d Cir.1989). In addition, after a motion to suppress a confession has been denied, the evidence must be viewed in the light most favorable to the government. *United States v. Jackson,* 652 F.2d 244, 246 (2d Cir.), cert. denied, 454 U.S. 1057, 102 S.Ct. 605, 70 L.Ed.2d 594 (1981).

However, regardless of what we have said in other situations concerning the standard of review on a claim of waiver, compare *United States v. Hall,* 724 F.2d 1055, 1060 (2d Cir.1983), with *United States v. Diaz,* 891 F.2d at 1061, appellant Caba's claim raises an issue of law. Caba argues that Agent Cecil violated *Miranda* by relying on Perez, a confidential informant with an interest in Caba's conviction, to translate the Miranda warnings to Caba. Caba cites *United States v. Villegas,* 928 F.2d 512 (2d Cir.), cert. denied, — U.S. —, 112 S.Ct. 137, 116 L.Ed.2d 104 (1991), for the proposition that the warnings he received were inadequate as a matter of law. In *Villegas,* an agent, after attempting unsuccessfully to read a Spanish language card (containing a translation of the Miranda warnings) to defendant Gonzalez, allegedly asked Villegas—Gonzalez's co-defendant—to read the card to Gonzalez while the agent followed along. At the suppression hearing, Villegas testified for the defense that he had not read the Spanish language card to Gonzalez. The district court nevertheless credited the testimony of the agent and determined that Gonzalez was fully informed of his Miranda warnings. *Villegas,* 928 F.2d at 516. Although this court affirmed, we criticized the government's use of one defendant to

provide a translation for a confessing co-defendant. Id. at 518.

We agree with Judge Sweet that the government should, when feasible, avoid the use of informants to translate Miranda warnings. Like Villegas, Perez had an incentive to incriminate the person for whom he was providing a translation. Villegas might have wished to shift blame that could otherwise fall upon him; Perez presumably knew that a confession would increase the likelihood of Caba's conviction and that such a conviction would probably help Perez receive probation rather than a prison term for his own offense.

In spite of Perez's incentive, this is a stronger case for affirmance than was *Villegas*. Unlike the confessing co-defendant in *Villegas*, Caba understood some English. Also, because the alleged translator in *Villegas* testified that the translation had never actually occurred, the government was unable to call any witnesses who could testify directly to the Spanish content of the translation. At this suppression hearing, on the other hand, the government called the witness—Perez—who had translated the warnings to elaborate the content of that translation, and Perez was subjected to extensive cross-examination. Moreover, it is worth noting that Judge Sweet was not the only fact-finder to believe Perez's testimony. Perez was a key government witness at the subsequent trial, and the jury must have believed him as well.

On this record, we decline the invitation to disturb Judge Sweet's conclusion, based on the testimony of Agent Cecil and Ramon Perez, that Caba knowingly and voluntarily waived his constitutional rights. Moreover, as we have reiterated in the past, "this Court has steadfastly avoided the adoption of any criterion that, in and of itself, would mandate a finding of involuntariness and thereby undermine a thorough analysis of all the relevant circumstances." *Bye*, 919 F.2d at 9. Therefore, we refuse to create a per se rule that such translations by an informant or a co-defendant are constitutionally inadequate as a matter of law, although common sense would dictate that they should be avoided whenever other options are available.

*Sentencing.*

■ Both appellants challenge Judge DiCarlo's determination of their base offense levels under the Sentencing Guidelines. They claim that the district court failed to make its own findings as to the intent and ability of each defendant to purchase the quantity of heroin negotiated, as required by *United States v. Jacobo*, 934 F.2d 411, 416–17 (2d Cir.1991), decided after defendants' sentencing. Moreover, appellants argue that they did not have the money to purchase a kilogram or more of heroin, and that their respective offense levels were accordingly too high. Under § 2D1.4 of the Guidelines, if a defendant is convicted of a conspiracy to purchase narcotics, the offense level is the same as if the object of the conspiracy had been completed. However, appellants point out that application note 1 to this section provides:

> [W]here the court finds that the defendant did not intend to produce and was not reasonably capable of producing the negotiated amount, the court shall exclude from the guideline calculation the amount that it finds the defendant did not intend to produce and was not reasonably capable of producing.

Finally, appellants argue that the jury was improperly instructed concerning its special verdict on the quantity of heroin involved in the conspiracy.

The government responds that appellants' challenges to the sentencing overlook the fact that Judge DiCarlo did not rely upon the jury's special verdict to set the base offense levels for appellants, but instead permissibly relied upon the undisputed findings of the probation department that appellants had conspired with respect to 1400 grams of heroin. Furthermore, according to the government, appellants' failure to object to the factual findings in the presentence report waived the claims they now press in this court.

As we stated above, the probation department prepared a presentence report that detailed the facts of appellants' offenses and concluded that their conspiracy

had involved 1400 grams of heroin, setting each defendant's offense level at 32. At sentencing, Judge DiCarlo asked whether each appellant and his counsel had read the presentence report, to which the attorneys answered, "yes," and whether any issues were in dispute, to which the response was negative. The judge then adopted the findings of the probation department and sentenced each defendant accordingly.

In *Jacobo,* this court remanded where the district court mistakenly believed itself bound by the jury's verdict as to the quantity of drugs involved and therefore declined to make independent findings with respect to the defendant's intent and ability to deliver that quantity. See *Jacobo,* 934 F.2d at 416–17. Appellants claim that the district court in this case also failed to make its own independent findings as to the quantity of drugs that could have been involved. However, Judge DiCarlo, unlike the judge in *Jacobo,* made no reference to the jury's special verdict with regard to quantity in calculating the base offense levels but simply adopted the factual findings and guideline applications in the presentence report. Indeed, as we have said, the judge specifically inquired whether any of these findings were disputed and was told that none of them were. Appellants had the responsibility to advise the sentencing judge that there was a question regarding their reasonable capacity to produce a negotiated amount of money or drugs. While in *Jacobo,* "the matter of [defendants'] intent and ability to produce five kilograms of cocaine was not pursued as vigorously as it might have been at the sentencing stage," 934 F.2d at 416, Caba and Valdez failed entirely to pursue the capacity issue at sentencing. Since neither appellant so much as said to Judge DiCarlo that the amount in the presentence report was incorrect or that they could never have bought that much, it was reasonable for the judge to adopt the findings in the presentence report as to drug quantity.

Nor does application note 1 to Guideline § 2D1.4 materially help appellants here. That note provides an exception to the general rule of § 2D1.4 where a judge finds that a defendant "was not reasonably capable" of going through with a negotiated deal. But Judge DiCarlo in effect found the reverse, that appellants were capable of going through with the deal.

■ Furthermore, appellants may not seek a remand from this court on a factual issue that could have been presented to the sentencing judge for consideration. *United States v. Soliman,* 889 F.2d 441, 445 (2d Cir.1989); *United States v. Bufalino,* 576 F.2d 446, 453 (2d Cir.), cert. denied, 439 U.S. 928, 99 S.Ct. 314, 58 L.Ed.2d 321 (1978). Appellants claim that under *United States v. McCall,* 915 F.2d 811, 814 (2d Cir.1990), this court should reach the merits of sentencing guidelines issues even if the issues were not raised below. But the underlying rationale of *McCall* does not apply here. In *McCall,* we were concerned that defendants not be penalized for failing to comprehend the complexity of the fairly new Sentencing Guidelines. See id. In this case, however, defendants needed only to state that the heroin amount in the presentence report was inaccurate in order to preserve their objections for appeal. They had opportunities to do so both before and during the sentencing proceedings. Indeed, although *Jacobo* had not yet been decided, appellants were on notice that "[t]he determination of the quantity of [drugs] for purposes of calculating a base offense level is a factual determination for the court...." *United States v. Campuzano,* 905 F.2d 677, 680 (2d Cir.), cert. denied, ─── U.S. ───, 111 S.Ct. 363, 112 L.Ed.2d 326 (1990). Yet appellants failed to raise any objections at sentencing and have therefore waived the issue for appeal.

■ Finally, appellants claim that in responding to the jury's questions, the judge erroneously instructed the jury on how to calculate drug quantity and thereby tainted the sentences. This claim rests on the assumption that the district court relied upon the jury's special verdict. As indicated above, there is no evidence of such reliance by the district court. The judge specifically adopted the findings of the presentence report after appellants expressed no objection to those findings. Since the ultimate

sentence did not rely upon the special verdict but upon the presentence report, it follows that the jury's alleged misconceptions upon which the special verdict was based are—as the government asserts—irrelevant and harmless. Appellants argue that it is disingenuous to maintain that the judge and the probation department made factual findings that were independent of the jury's. In the absence of any evidence to the contrary, however, we feel compelled to disagree.

We have considered all of appellants' arguments and find them to be without merit. For the reasons set forth above, the judgments of conviction are affirmed.