John DIEHL, Plaintiff,

v.

Timothy MUNRO and Pierce Gallagher, individually and in their official capacities as officers of the New York State Police, Defendants.

No. 00–CV–469.

United States District Court, N.D. New York.

Oct. 2, 2001.

Ricken, Goldman, Sussman & Blythe, Attorney for Plaintiff, Kingston, Alan N. Sussman, of counsel.

Eliot Spitzer, Attorney General for the State of New York, Attorney for Defendants, Department of Law, Albany, David B. Roberts, Esq., Assistant Attorney General, of counsel.

## MEMORANDUM–DECISION AND ORDER

HOMER, United States Magistrate Judge.

This case presents a routine contact between police and a private citizen in otherwise innocent circumstances which escalated into the unfortunate and unnecessary arrest and detention of the private citizen. On September 22, 1999, plaintiff John Diehl ("Diehl") was arrested by defendants Timothy Munro ("Munro") and Pierce Gallagher ("Gallagher"), both investigators in the New York State Police Bureau of

Criminal Investigation. As a result of the events surrounding and following that arrest, Diehl commenced this action alleging that the defendants violated various of his civil rights. Diehl seeks recovery of compensatory and punitive damages as well as attorney's fees under 42 U.S.C. § 1983 and related federal and state laws. A bench trial was held on September 6, 2001. In accordance with Fed.R.Civ.P. 52, what follows constitutes the Court's findings of fact and conclusions of law.

## I. Findings of Fact

On Wednesday, September 22, 1999 at approximately 2:00 a.m., Diehl arrived at a parking area in Kingston, Ulster County, near Exit 19 off the New York Thruway. The area, designated a "Park & Ride," was used by commuters to park their vehicles and to board public transportation for travel to and from their employment. Diehl was driving a 1986 Chevrolet van in which he lived. The van had windows on the front and on the driver's, passenger's and rear doors. Curtains covered the rear windows and separated the driver's area of the van from the rear. Diehl utilized the rear area to sleep and to maintain his belongings and equipment used for his employment as a part-time cabinet finisher. Diehl parked the van facing out in an isolated area of the Park & Ride away from the area of the lot generally used by commuters. Diehl went to sleep in the rear of the van, arose shortly after 12:00 noon and moved forward to the driver's seat, wearing only the underwear in which he had slept. Diehl rolled down the window on the driver's side.

At about the same time, Gallagher and Munro, wearing plain clothes, were then driving in a unmarked vehicle around a traffic circle near the Park & Ride. They spotted Diehl's van. Gallagher and Munro were aware that there had been a number of robberies of construction site equipment in the area in the past months, that such equipment was often left in an area near the Park & Ride by construction crews working in the area, that the theft of such equipment would require a larger vehicle, such as a van, to transport the equipment, and that the thieves might scout the area and equipment before a theft. Gallagher and Munro were further aware that a robbery had occurred in Catskill, near Exit 21 off the Thruway, earlier that morning and possessed a composite photograph of the person who allegedly committed that robbery.

Gallagher and Munro deciding to investigate, pulled their car into the Park & Ride lot, exited their car and walked toward Diehl's van. Approximately ten feet from the van, Gallagher and Munro each displayed their badges and stated, "State Police." Diehl replied, "You caught me." Gallagher and Munro proceeded to the driver's side of the van. They observed Diehl clad in what appeared to be only an undershirt as the undershirt covered Diehl's underpants. Munro also observed a rag with red stains hanging across the steering column. Gallagher and Munro noted a vague resemblance to the composite photograph of the individual wanted for the robbery in Catskill.[1]

Gallagher asked Diehl who he was. Diehl identified himself and said that he was "just sitting there." Gallagher then asked for identification. Diehl's wallet, which contained his driver's license, was in the pocket of his pants hanging in the rear of the van. However, Diehl responded first by pointing to the registration for the

---

1. The composite photograph depicts a white male with long black hair approximately 20–30 years of age. Trial Ex. D–5. Diehl is a white male with long white hair who was then sixty-three years of age.

van affixed to the front windshield and told Gallagher to check it out. When Gallagher persisted in his request for picture identification such as a driver's license, Diehl provided a business card bearing his name. When Gallagher continued to request his driver's license or a picture identification, Diehl contested Gallagher's right to demand the license, contending that he had done nothing wrong and was not required to provide the officers with any further information. Gallagher told Diehl that the officers would leave him alone once he showed them his license. Diehl told Gallagher that his driver's license was in the rear of the van, but he declined to retrieve it or to allow Munro to do so. This discussion remained polite but continued for approximately thee to five minutes.

Gallagher then told Diehl to exit the van. Diehl pushed the lock down on the driver's side door [2] and began rolling up the window. Gallagher reached through the window, unlocked the door and pulled it open. Diehl held onto the door, but Gallagher succeeded in pulling it open sufficiently for him to grab Diehl and begin pulling him from the seat. Diehl moved his hands from the door to the steering wheel and held it to prevent Gallagher from pulling him from the seat. Munro moved around to the driver's side and, with Gallagher, succeeded in pulling Diehl from the van and placing him in handcuffs. Gallagher then entered the front of the van and conducted a search for weapons and identification. He found personal papers of Diehl's in a folder behind the driver's seat and looked through them. He looked through the curtain to the rear of the van to see if any other persons were in the van but found none.

Diehl was then taken to the officer's vehicle while a uniformed officer was called to transport Diehl to the police station. Diehl was still clad only in his underwear and became chilled. He requested clothing and Munro attempted to open the side door of the van to retrieve Diehl's clothing. When Munro was at first unable to open the side door, Diehl instructed him on how to do so, Munro opened the door and retrieved Diehl's pants and shoes. In the pants Munro found Diehl's wallet containing his driver's license. The officers seized the driver's license as well as the red stained rag. Diehl was taken to the police station for processing. Munro filed two informations charging Diehl with obstructing governmental administration in the second degree, N.Y. Penal Law § 195.05 (McKinney 1999), and resisting arrest, N.Y. Penal Law § 205.30 (McKinney 1999). Diehl was then arraigned before a town justice, bail was set at $2,000.00, and Diehl was remanded to the Ulster County Jail. He remained there for five days before he was released on bail. Before criminal trial, Diehl moved to dismiss the charges on various grounds. The prosecution did not oppose the motion and it was granted. This action followed.

## II. Conclusions of Law

Diehl's complaint asserts four causes of action against both Munro and Gallagher. The first seeks recovery under section 1983 and alleges that the defendants falsely arrested, unlawfully imprisoned, maliciously prosecuted and unlawfully searched and seized in violation of the Fourth and Fifth Amendments. The second, third and fourth seek damages for false arrest, unlawful detention and malicious prosecution under New York law.

---

**2.** Munro had already determined that the passenger side door was locked by attempting to

open that door.

## A. Probable Cause

Diehl's claims for false arrest, unlawful imprisonment and malicious prosecution under both section 1983 and New York law all require evidence, *inter alia*, that a defendant lacked probable cause to arrest, detain and prosecute the plaintiff. *See, e.g., Rohman v. New York City Transit Auth.*, 215 F.3d 208, 215 (2d Cir.2000) (malicious prosecution under New York law); *Covington v. City of New York*, 171 F.3d 117, 127 (2d Cir.1999) (malicious prosecution under section 1983); *Weyant v. Okst*, 101 F.3d 845, 853 (2d Cir.1996) (false arrest and unlawful imprisonment under both section 1983 and New York law).. Thus, Diehl's claims for false arrest, unlawful imprisonment and malicious prosecution under both section 1983 and New York law require that the defendants lacked probable cause for the arrest, detention and prosecution of Diehl.

Probable cause for a warrantless arrest exists when, at the moment of arrest, police have knowledge of facts and circumstances which is reasonably trustworthy and sufficient to warrant a belief that an offense has been committed and that the person to be arrested committed it. *See Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964); *Singer v. Fulton County Sheriff*, 63 F.3d 110, 119 (2d Cir.1995); *see also Wong Sun v. United States*, 371 U.S. 471, 479, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963) (probable cause requires more than "mere suspicion"). Probable cause must be assessed from the "totality of the circumstances." *Illinois v. Gates*, 462 U.S. 213, 230, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). The determination of probable cause requires a court to find the facts which were known to the police at the time of the arrest and then to determine "whether these historical facts, viewed from the standpoint of a reasonable police officer," sufficed to constitute probable cause. *Ornelas v. United States*, 517 U.S. 690, 696, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996).

Here, Diehl was arrested for obstructing governmental administration and resisting arrest. An arrest for obstructing governmental administration requires probable cause to believe that (1) a person prevented or attempted to prevent another from performing a function, (2) the other person was a public servant, (3) the function was an official action authorized by law, and (4) the obstruction was sought to be accomplished by means of intimidation, force or interference. N.Y. Penal Law § 195.05; *see also Lennon v. Miller*, 66 F.3d 416, 424 (2d Cir.1995). An arrest for resisting arrest requires probable cause to believe that (1) a person takes action to interfere with another person, (2) the act is done intentionally, (3) the other person is a police officer, and (4) the action prevents or seeks to prevent an authorized arrest. N.Y. Penal Law § 205.30. Defendants agree that probable cause for resisting arrest requires that probable cause exist for the underlying offense—here, obstruction of governmental administration. Defs. Pretrial Mem. of Law (Docket No. 20), p. 21; *People v. Ailey*, 76 Misc.2d 589, 350 N.Y.S.2d 981 (1974).

An arrest occurs when an individual is restrained and his freedom of movement is restricted. *See Posr v. Doherty*, 944 F.2d 91, 98 (2d Cir.1991). Diehl was restrained and his freedom of movement restricted for the first time when Gallagher placed his hands on Diehl and began pulling Diehl from the seat. The events leading up to that moment involved no restraint on Diehl or any searches and, therefore, implicated no Fourth Amendment interests. Thus, the issue presented is whether the defendants had probable cause to arrest Diehl for obstructing governmental administration at the moment

Gallagher first placed his hands on Diehl. At that moment, the defendants had knowledge of the following facts and circumstances:

— Diehl's van was parked in an isolated area of the Park & Ride lot. A reasonable police officer could, as the defendants did, suspect the possibility of criminal activity given the prior construction equipment robberies, the fact that the van was large enough to be used in such robberies, the presence of construction equipment in the vicinity and the possibility that the occupant of the van could be observing the area for a possible robbery. The defendants thus had reason to determine what, if anything, was occurring in the vicinity of the van.

— After the defendants identified themselves as police officers, Diehl said to them, "You caught me." Although there could be innocent explanations for such a statement, as in fact there was here,[3] it was not unreasonable for this remark to heighten the defendants' suspicions that criminal conduct was in progress.

— The defendants observed Diehl in the driver's seat of the van clad in what from their vantage point appeared to be only an undershirt. The location of the van, Diehl's statement and this observation reasonably suggested the possibility that a sex-related offense was being or had been committed. These factors also reasonably suggested the possibility that Diehl himself was in need of assistance if, for example, further investigation established that he was mentally ill and posing a danger to himself or others.

— The defendants could observe that Diehl bore a vague resemblance to a composite photograph which they had viewed of a person wanted for a crime committed earlier that day two Thruway exits north of the van's location.

— Munro observed the red stained rag hanging over the steering column.[4]

— When the defendants asked Diehl for picture identification, Diehl first pointed to the vehicle registration in the front windshield, then provided a business card, and then debated the right of the defendants to demand a picture identification without ever providing any such identification. The defendants could reasonably conclude that such evasive conduct was intended to conceal criminal activity.

Viewed separately and from the point of view of Diehl, these circumstances were innocent and afforded no basis for seizure or further action by the defendants. However, such circumstances must be viewed in their totality rather than in isolation. *See Illinois v. Gates*, 462 U.S. at 230, 103 S.Ct. 2317. Moreover, such circumstances must be viewed from the point of view of a reasonable police officer rather than from that of Diehl or that of a private citizen. *See Ornelas v. United States*, 517 U.S. at

---

**3.** Diehl testified that he meant only that the defendants had caught him dressed only in his underwear.

**4.** The rag was later seized by Munro, was retained as evidence in the custody of the State Police, was lost or destroyed and could not be produced for trial. Diehl contends that he is entitled to an adverse inference from the defendants failure to produce the rag. *See Zimmermann v. Associates First Capital Corp.*, 251 F.3d 376, 383 (2d Cir.2001). Assuming that the adverse inference applies, that inference is rebutted here by credible evidence that the rag existed, the description of the rag by both defendants, and Diehl's testimony that his most recent employment had involved the use of a red stain similar to what the defendants observed on the rag. Thus, although the probative value of the rag is limited in the circumstances presented here, the Court finds that the defendants have rebutted any adverse inference from its non-production at trial and the evidence will be considered.

696, 116 S.Ct. 1657; *Cerrone v. Brown,* 246 F.3d 194, 202 (2d Cir.2001). So viewed, these facts established a reasonable suspicion that Diehl was involved in criminal activity but fell short of establishing probable cause to arrest Diehl.

■■■■ The Fourth Amendment permits a police officer to make a brief detention of a person to conduct further investigation when the officer has a "reasonable articulable suspicion" of criminal activity. *Terry v. Ohio,* 392 U.S. 1, 22–24, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Like probable cause, such reasonable suspicion must be determined from the "totality of the circumstances," *see United States v. Cortez,* 449 U.S. 411, 417, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981), and from the point of view of a reasonable police officer. *See United States v. Villegas,* 928 F.2d 512, 516 (2d Cir.1991). The standard for reasonable suspicion for a *Terry* stop is less than that required to establish probable cause for an arrest. *See United States v. Montoya,* 473 U.S. 531, 541–44, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985); *Kerman v. City of New York,* 261 F.3d 229, 235 (2d Cir.2001); *United States v. Villegas,* 928 F.2d at 516 ("Conduct as consistent with innocence as with guilt may form the basis for an investigative stop where there is some indication of possible illicit activity"). However, the generalized fear of criminal activity and the presence of a person in a high crime area are not sufficient by themselves to establish reasonable suspicion. *See Brown v. Texas,* 443 U.S. 47, 52, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979). Where reasonable suspicion exists for a *Terry* stop, a person may be ordered to exit a vehicle. *See People v. Mimms,* 434 U.S. 106, 111, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977). If reasonable suspicion exists, police may detain a person to determine his or her identity. *See Adams v. Williams,* 407 U.S. 143, 146, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972); *United States v. Thomas,* 863 F.2d 622, 628 (9th Cir.1988) (brief questioning during investigative stop permitted to establish identity and determine why detainee in parking lot); *United States v. Abokhai,* 829 F.2d 666, 670 (8th Cir.1987) (brief questioning during investigatory detention permitted when police did not display weapons and inquiry only requested identification and explanation of presence).

Here, the circumstances as they reasonably appeared to the defendants provided reasonable suspicion that criminal activity was afoot. In particular, the type and location of Diehl's vehicle, his statement that "You caught me," his apparent state of undress, the rag and his evasiveness when requested to produce identification gave the defendants reasonable cause to suspect that Diehl was involved in robbery or sexual assault sufficient to permit a brief detention of Diehl for further investigation.[5] Thus, Gallagher was authorized

---

**5.** Diehl contends that a *Terry* stop was improper because the van was parked and not on a street. However, a *Terry* stop may be made not only of a vehicle on a street but whenever police reasonably suspect criminal activity. *See, e.g., United States v. Maher,* 145 F.3d 907, 909 (7th Cir.1998) (*Terry* stop of person on foot); *United States v. Leshuk,* 65 F.3d 1105, 1109 (4th Cir.1995) (stop near area where marijuana grown). Diehl also contends that a *Terry* stop requires reasonable suspicion for a specific crime, not generalized criminal activity. First, such determination depends on the circumstances presented and the degree of specificity of the officer's suspicions may vary from case to case. Here, the nature of the circumstances presented to the defendants suggested several possible forms of criminal activity and the defendants were permitted to consider all such forms. Second, the circumstances supported a reasonable suspicion that Diehl was engaged in robbery and sexual assault. Therefore, any requirement of such specificity was satisfied here.

under the Fourth Amendment to direct Diehl to exit the van to investigate the matters further and to remove Diehl from the van when he refused to comply.

 When Diehl attempted to lock the door and hold it closed to prevent Gallagher from opening it and removing Diehl from the van, such conduct satisfied the elements for a violation of obstructing governmental administration. That is, Diehl attempted to prevent Gallagher from removing him from the van, Gallagher was a public servant, Gallagher's removal of Diehl from the van was an official and authorized action under *Terry* and its progeny, and Diehl sought to accomplish this by interfering with Gallagher's efforts to remove him from the van. When Diehl grabbed the steering wheel to prevent Gallagher and Munro from taking him out of the van, Diehl resisted arrest in that he intentionally interfered with the defendants when they lawfully attempted to arrest him for obstructing governmental administration. Because probable cause existed for the defendants to arrest, detain and prosecute Diehl on both charges, Diehl's claims for false arrest, unlawful imprisonment and malicious prosecution under both section 1983 and New York law must fail.

## B. Search and Seizure

After Diehl was arrested, Gallagher entered the front of the van and conducted a search of that area which lasted less than one minute. Minutes later, Munro entered the rear of the van and retrieved Diehl's shoes and pants, containing Diehl's wallet and driver's license. Diehl's final claim is that these warrantless searches violated the Fourth Amendment prohibition against unreasonable searches and seizures. Diehl asserts this claim in his first cause of action under section 1983.

### 1. Gallagher's Search

 After making a valid custodial arrest, police may conduct a warrantless search even without probable cause or reasonable suspicion. *See New York v. Belton*, 453 U.S. 454, 461, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981); *Michigan v. DeFillippo*, 443 U.S. 31, 35, 99 S.Ct. 2627, 61 L.Ed.2d 343 (1979). Police may conduct such a search for both evidence and weapons. *See United States v. Robinson*, 414 U.S. 218, 229, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973) (inspection of crumpled cigarette pack permissible as search incident to arrest); *United States v. Rodriguez*, 995 F.2d 776, 778 (7th Cir.1993) (search of wallet and address book permissible as search incident to arrest). Police may search the space immediately adjacent to that where the defendant was arrested. *See Maryland v. Buie*, 494 U.S. 325, 334, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990); *United States v. Queen*, 847 F.2d 346, 352–54 (7th Cir.1988) (search of closet incident to arrest permissible even though defendant was then handcuffed and standing three feet away because defendant found hiding in closet at time of arrest). Where, as here, an arrest occurs while the defendant is located in a vehicle, police may search the passenger compartment, and any containers therein, even after they have exclusive control of the compartment. *See New York v. Belton*, 453 U.S. at 462, 101 S.Ct. 2860; *United States v. Scopo*, 19 F.3d 777, 782 (2d Cir.1994). The validity of a search incident to arrest depends on the legality of the arrest. *See United States v. Robinson*, 414 U.S. at 235, 94 S.Ct. 467; *McCardle v. Haddad*, 131 F.3d 43, 49–50 (2d Cir.1997) (no valid search of vehicle incident to arrest where defendant not first arrested but only detained).

 Here, as discussed above, Diehl was first lawfully arrested while seated in the driver's seat of his van. Af-

ter Diehl was handcuffed, Gallagher properly searched the front part of the van, including the folder containing personal papers. This search was thus conducted incident to Diehl's arrest[6] and did not violate his rights under the Fourth Amendment.[7]

### 2. Munro's Search

■ Diehl was clad only in his underwear when he was arrested. He became chilly as they waited for uniformed officers to respond to the scene and asked the defendants for his pants and shoes. Munro attempted to enter the back of the van to retrieve Diehl's pants and shoes by entering the side door as the rear doors were pressed against trees. Munro was unable immediately to open the side door. Diehl then instructed Munro how to open the door. Munro did so, retrieved Diehl's pants and shoes from the rear of the van, removed Diehl's wallet containing his driver's license, and provided the pants to Diehl. Diehl contends that Munro's entry into the rear of the van constituted a violation of the Fourth Amendment. Defendants contend that Diehl consented to the search.

■ Police may lawfully search without a warrant an area otherwise protected by the Fourth Amendment based on an individual's voluntary consent and any evidence discovered during the search may be seized. *See Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). The existence and voluntariness of the consent must be determined from the totality of the circumstances. *See id.,* at 227, 93 S.Ct. 2041; *United States v. Yu–Leung,* 51 F.3d 1116, 1119 (2d Cir.1995). Consent may be implied from an individual's words or conduct. *See United States v. Garcia,* 56 F.3d 418, 423 (2d Cir.1995).

Here, the evidence is undisputed that Diehl both requested the defendants to retrieve his pants and shoes from the rear of the van and instructed Munro how to open the side door. Such words and conduct reasonably constituted consent by Diehl for Munro to enter the rear of the van. Moreover, because the request for the pants and shoes was generated by Diehl, because Diehl's prior conduct evidenced his knowledge and ability to refuse consent to the police and from the totality of the circumstances, the defendants have met their burden of establishing the voluntariness of Diehl's consent to Munro's search. Because Munro's entry into the rear of the van was valid, he could lawfully seize Diehl's wallet from the pants as evi-

---

6. The defendants argue in their memorandum of law that this search was incident to the *Terry* stop rather than the arrest. Defs. Pretrial Mem. of Law at 25–26. Such searches may occur "when police have a reasonable belief that the suspect poses a danger." *Michigan v. Long,* 463 U.S. 1032, 1049, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983). However, the searches here occurred after Diehl was handcuffed and outside the van. At the time the searches were conducted, Diehl had already been arrested and detained, and he no longer posed a danger to the defendants. Accordingly, no basis existed for conducting a protective search pursuant to the *Terry* stop.

7. Gallagher testified that while searching the front section of the van, he looked through the curtain dividing the front section from the rear to assure that no one else was present in the van, either as a threat to the defendants or as the possible victim of a sexual assault. In the circumstances presented here, Gallagher was justified in glancing briefly into the rear of the van to insure that no other persons were present who might pose a danger to the defendants or were in need of assistance. *See McCardle v. Haddad,* 131 F.3d at 48; *United States v. Jaramillo,* 25 F.3d 1146, 1151 (2d Cir.1994); *United States v. Paulino,* 850 F.2d 93, 97 (2d Cir.1988).

dence. Therefore, Diehl's claim regarding this search must be denied.[8]

### C. Qualified Immunity

■ Police officers "generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396(1982). Given the facts found herein, a reasonable police officer in these circumstances could have believed that probable cause existed for the arrest, detention and prosecution of Diehl and that there were legal bases to conduct the searches of the van. Accordingly, in the alternative, the defendants are entitled to judgment on this ground on the claims asserted in the first cause of action under section 1983.

### III. Conclusion

For the reasons stated above, it is hereby

**ORDERED** that judgment is granted to the defendants in all respects.

**IT IS SO ORDERED.**

---

8. Munro testified that when he first entered the rear of the van, he looked around to insure that no one else was present before retrieving the pants and shoes. This brief visual examination was a proper protective search. *See* note 7 *supra.*