**UNITED STATES of America,
Plaintiff,**

v.

**Richard PARKER, Defendant.**

**No. 01–CV–80944–DT.**

United States District Court,
E.D. Michigan,
Southern Division.

May 13, 2002.

Carl D. Gilmer–Hill, Detroit, MI, for plaintiff.

Richard M. Helfrick, Detroit, MI, for defendant.

**ORDER GRANTING DEFENDANT'S
MOTION TO SUPPRESS**

BORMAN, District Judge.

This is a criminal case involving a single count indictment charging Defendant Richard Parker with a violation of 18 U.S.C. § 922(g)(1)—felon in possession of

a firearm. Now before the Court is Defendant's motion to suppress the firearm as well as certain statements concerning the location of the firearm made by Defendant after his arrest. The Court conducted an evidentiary hearing and heard oral argument on February 15, 2002 and March 21, 2002. Having considered the entire record, and for the reasons that follow, the Court GRANTS Defendant's motion to suppress.

## BACKGROUND

The Court conducted an evidentiary hearing with regard to Defendant's motion to suppress on February 15, 2002. On this date, Defendant presented the testimony of two witnesses: Defendant Parker and Myael Lowe. The Court adjourned the hearing in order to permit the Government to present witnesses. The hearing was continued on March 21, 2002, at which time the Government presented the testimony of Sergeant Kenneth Krupka, testimony which primarily dealt with Defendant's Fifth Amendment issues—i.e., Defendant's post arrest statements concerning the firearm. Sergeant Krupka was not present at the time of the initial confrontation. The Government did not call Officers Reilly and Adams who had the initial contact with Defendant. The Government relied, instead, on its legal argument, as applied to Defendant's uncontested version of the initial confrontation between Defendant and the officers.

## I. Uncontested Facts

The incident in question took place on October 17, 2000 in Detroit, Michigan. At

some time between 11:30 pm and midnight, Defendant Richard Parker and a friend, Myael Lowe, walked to a nearby convenience store to get something to eat.[1] (Feb. 15, 2002 Tr. at 13, 20–21.) Defendant and Mr. Lowe made their purchases and left the store. (*Id.* at 14–15, 21.) According to Mr. Lowe, he and Defendant were not loitering at the store—in fact, the undisputed testimony indicates that they were only there for about three minutes. (*Id.* at 18.) Defendant acknowledges that he had a firearm in the front pocket of his wind breaker.

As they left the store, two plain clothed Detroit police officers, Reilly and Adams, pulled into the parking lot in a cranberry colored unmarked automobile, which plain-clothed Detroit police officers commonly utilize in the area. (*Id.* at 21–22.) Both the Defendant and Mr. Lowe testified that one of the officers asked them to "come here." (*Id.* at 15, 22, 32.) Defendant and Mr. Lowe complied with this request, not believing at that point that they were under arrest. (*Id.* at 15, 22, 32–33.)

At this point, the uncontested testimony indicates that Officers Reilly and Adams jumped out of the unmarked patrol car and ordered Defendant to put his hands on the front of the car—an order which Defendant complied with. (*Id.* at 15, 22, 34). The following colloquy took place between Defendant and counsel for the Government at the evidentiary hearing:

Counsel:   You were just walking out of the store?
Defendant:   Yeah, because we be in the store and they come up there, you know, and they talked to certain people. I just walked up to the car, you know.
Counsel:   Okay.

1. According to the testimony of Sergeant Krupka, the convenience store is located in a "high-crime area." (March 21, 2002 Tr. at 7.) The area primarily consists of residential dwellings—two schools are located in the immediate vicinity. (*Id.* at 9.) The area has a high incidence of narcotics sales. (*Id.*) The

party store at issue in this case was raided by narcotics officers "not quite a year ago". (*Id.*) Officers Reilly and Adams were informed by Sergeant Krupka that the convenience store was located in a high-crime area. (*Id.* at 22.)

Defendant: And the they jumped out and told me to get on the car.

. . . .

Counsel: So I believe you just said you know that they come up and they want to talk to people?

Defendant: Uh-huh.

. . . .

Counsel: Okay. And so you went to the car and they told you to put your hands on the car?

. . . .

Defendant: Yes.

(*Id.* at 33–34) (*see also id.* at 22) ("And I go to the car and the other guy [Lowe] was riding around on the bike. The other cop jumped out of the car and—the cop jumped out of the car, they told him to lay face on the car, put my hands down on the car.").

The officers then spread Defendant's arms and legs apart and began to frisk the Defendant. (*Id.* at 16, 22, 34–35.) During this pat-down search, one of the officers discovered and grabbed the firearm in Defendant's windbreaker. (*Id.*) The following colloquy took place between Defendant and counsel for the Government:

Counsel: And then you were saying that they patted you down?

Defendant: Yes, they literally patted me down.

Counsel: Okay. Thank you. And while they were patting you down, you took off?

Defendant: No. While he was patting me down -

Counsel: Okay.

Defendant: And he grabbed the gun.

. . . .

Counsel: Okay. So when the passenger officer was patting you down, during that patdown is when you fled? You're saying that he was patting you down and you think he felt a gun on you?

Defendant: No. He was patting me down and he grabbed the gun in his clutches. He had the gun in his hand and then I fled.

Counsel: And so you ran after the—during—after the patdown or at some point during the patdown you ran?

Defendant: Yeah, I did, I grabbed the gun and I ran.

(*Id.* at 34–35.)

Defendant grabbed the gun and ran—attempting to get rid of the weapon discovered by the officer during the pat-down search. (*Id.* at 35–36.) While fleeing from the scene, Defendant threw the firearm

into the bushes of an acquaintance's home. (*Id.* at 22.) Defendant continued to run for another block and a half, at which time he threw up his hands and laid on the grass, where he was apprehended and handcuffed. (*Id.* at 23.)

## II. Contested Facts

The officers on the scene, including uniformed officers responding to the incident, were unable, initially, to locate the firearm discarded by Defendant.

### (a) Defendant's Version of Events

According to Defendant, when the police reached him as he lay on the grass, he was physically assaulted by the pursuing officer—he alleges that he was hit in the stomach and slammed to the ground. (*Id.* at 24.) Thereafter, he was taken to an unmarked police vehicle, at which time he alleges, that in response to questioning about the location of the gun, he pointed in the direction in which he threw the firearm in order to put an end to the beating. (*Id.*) The officers, with this assistance, still could not locate the gun. (*Id.* at 25.)

Defendant alleges that he was then spoken to by Sergeant Krupka, who arrived on the scene after Defendant was apprehended. (*Id.* at 26.) Krupka allegedly expressed his concern that an innocent child might get killed if the gun was found by one of the children in the neighborhood. (*Id.* at 27–28.) Krupka then allegedly promised Defendant that he would not be charged with the gun offense if he revealed the location of the firearm.[2]

At this point, Defendant alleges that the told Krupka that the gun was in the bushes. Defendant alleges that he disclosed the location of the gun because (1)

2. Defendant had an outstanding arrest warrant—Krupka allegedly indicated that Defendant would only be prosecuted on this outstanding warrant, i.e., no charges would be filed based on the incident at issue. (*Id.* at 28.)

"where I threw the gun at, I know the people, and I know she has kids that—we all playing in the yard, in the front yard. And the gun was right in the front yard. Anybody could have seen it in the morning or the daylight, you know, anybody could have seen it"; and (2) because of Krupka's promise of leniency. (*Id.* at 29–30.) Defendant alleges that he was not informed of his *Miranda* rights prior to making these statements. (*Id.* at 30.)

### (b) Krupka's Version of Events

Sergeant Krupka testified that he arrived on the scene after the conclusion of the chase—after Defendant had been secured. (March 21, 2002 Tr. at 11.) His officers were conducting a search of the area in order to locate the firearm discarded by Defendant. (*Id.* at 12–13.) Because the officers were unable to find the gun, Sergeant Krupka decided to speak with the Defendant. (*Id.* at 13.)

Sergeant Krupka did not observe any injuries on Defendant, although he did note that the Defendant was "winded" and "sweaty." (*Id.* at 14–15.) According to Sergeant Krupka, he then asked the Defendant to reveal the location of the gun. (*Id.* at 15–16.) Sergeant Krupka testified that he stated:

> [A]ll the bullshit aside, I want to know where the gun is at. Where you tossed it. I don't want to see a child, nor do you want to see a child get ahold of that gun who don't know what it is and think it is a toy gun, and point it at his friend and blow his head off. Do you want to live with that, and at that point I got him out of the car, and he nodded in the direction where he saw he threw it in the bushes.

(*Id.* at 16.) Sergeant Krupka denies making any promises of leniency to Defendant. (*Id.* at 18.) He testified that he did not inform Defendant of his *Miranda* rights

because his main concern was finding the weapon. (*Id.* at 17.)

### III. Defendant's Motion to Suppress

Defendant filed the instant motion, seeking to suppress the firearm as well as his subsequent statements made to the police concerning the location of the firearm. Defendant argues that, when the officers seized him and patted him down, he was unlawfully seized in violation of the Fourth Amendment. He argues that the firearm, and his subsequent statements, are the fruit of this unlawful seizure, and therefore, must be suppressed. Defendant also argues that the pre-*Miranda* interrogation by Sergeant Krupka violated his rights under the Fifth Amendment.

The Government disagrees, arguing that Defendant was not "seized" at the time he fled from Officers Reilly and Adams. Instead, citing *California v. Hodari D.*, 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991) and its progeny, the Government argues that the pat-down of Defendant was an unsuccessful attempted seizure. Therefore, because the pat-down did not amount to a seizure of Defendant under the Fourth Amendment, the Government contends that the firearm was abandoned by Defendant while he was running from the police, and thus is not the fruit of an unlawful seizure. Finally, the Government argues that the pre-*Miranda* interrogation to secure the firearm clearly falls under the public policy safety exception enunciated by the Supreme Court in *New York v. Quarles*, 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984).

### ANALYSIS

### A. Fourth Amendment—Unlawful Search and Seizure

The Fourth Amendment to the United States Constitution states:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

u.S. CONST. amend IV.

The critical issue in this motion is whether Defendant was seized by the officers when the pat-down occurred, or alternatively, whether Defendant's subsequent flight rendered the pat-down an unsuccessful "attempted" seizure as contemplated by the U.S. Supreme Court in *Hodari D.*

The Fourth Amendment is only applicable to "searches and seizures" within the meaning of the Constitution. *Terry v. Ohio*, 392 U.S. 1, 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *United States v. Valentine*, 232 F.3d 350, 358 (3d Cir.2000) (noting that "there can be no Fourth Amendment violation until a seizure occurs"). According to the Supreme Court, "[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Terry v. Ohio*, 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *see also United States v. Mendenhall*, 446 U.S. 544, 552, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980) (opinion of Stewart, J.). A person is deemed "seized within the meaning of the Fourth Amendment *only if,* in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Mendenhall*, 446 U.S. at 554, 100 S.Ct. 1870 (opinion of Stewart, J.); *see also*

*Michigan v. Chesternut,* 486 U.S. 567, 573, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988) (acknowledging that the Supreme Court has embraced the test set forth by Justice Stewart).

▇▇▇ The Supreme Court clarified this holding in *Hodari D.* Justice Scalia, writing for the majority, held that the "only if" language used by the Court in *Mendenhall* "states a *necessary,* but not *sufficient,* condition for seizure." *Hodari D.,* 499 U.S. at 628, 111 S.Ct. 1547 (emphasis in original). According to the Court, a seizure occurs only when the defendant submits to an officers show of authority or when physical force is applied by the officer "even when it is ultimately unsuccessful." *Id.* at 626, 111 S.Ct. 1547. However, a seizure by physical force only occurs, of course, when the defendant's liberty is restrained by means intentionally applied. *County of Sacramento v. Lewis,* 523 U.S. 833, 844, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) (discussing *Brower v. County of Inyo,* 489 U.S. 593, 596–97, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1989)).

### (i) *Hodari D.* and its Progeny

▇▇▇ The Government argues that the Supreme Court's holding in *Hodari D.* dictates that the Defendant was not seized by Officers Reilly and Adams because he fled the scene after the firearm was discovered during the pat-down search of Defendant. This Court disagrees.

The issue before the Supreme Court in *Hodari D.* was whether the defendant, at the time he discarded the drugs in question while fleeing from the police, "had been" seized within the meaning of the Fourth Amendment.[3] *Id.* at 623, 111 S.Ct.

---

**3.** The facts in *Hodari D.* were straightforward. Officers were patrolling a high-crime area in Oakland, California. *Hodari D.,* 499 U.S. at 622, 111 S.Ct. 1547. Plain-clothed officers in an unmarked police car witnessed four or five youths surrounding a car. *Id.* When the youths saw the officers, they took flight. *Id.* at 622–23, 111 S.Ct. 1547. The officers gave

1547. This determination was of critical importance in the case because the state conceded that the officers did not have reasonable suspicion to stop the defendant. *Id.* at 623 n. 1, 111 S.Ct. 1547. Thus, if the defendant was deemed to have been seized when he saw the officers running toward him, the drugs discarded during the defendants period of fugitivity would be excluded as the fruit of an unlawful seizure. *Id.* at 623–24, 111 S.Ct. 1547.

The Court held that the defendant was not seized for Fourth Amendment purposes when the officers began to pursue Hodari. The Court held, as noted *supra,* that a seizure occurs only when the defendant submits to an officers show of authority or when physical force is applied by the officer "even when it is ultimately unsuccessful." *Id.* at 626, 111 S.Ct. 1547. Specifically, the Court reasoned:

> The language of the Fourth Amendment, of course, cannot sustain respondent's contention. The word "seizure" readily bears the meaning of a laying on of the hands or application of physical force to restrain movement, even when

it is ultimately unsuccessful. ("She seized the purse-snatcher, but he broke out of her grasp.") It does not remotely apply, however, to the prospect of a policeman yelling "Stop, in the name of the law!" at a fleeing form that continues to flee. That is no seizure. Nor can the result respondent wishes to achieve be produced—indirectly as it were, by suggesting that [the officer's] uncomplied-with show of authority was a common-law arrest, and then appealing to the principle that all common-law arrests are seizures. An arrest requires *either* physical force (as described above) *or,* where that is absent, *submission* to the assertion of authority.

*Id.* at 626, 111 S.Ct. 1547 (emphasis in original) (footnotes omitted). Consequently, the Court concluded that Hodari had not been seized for Fourth Amendment purposes because "assuming that [the officer's] pursuit ... constituted a 'show of authority' enjoining Hodari to halt, since Hodari did not comply with that injunction he was not seized until he was tackled."[4]

---

chase; as one officer closed in on Hodari, he tossed away a small rock, which later turned out to be crack cocaine. *Id.* at 623, 111 S.Ct. 1547. Hodari moved to suppress the cocaine, arguing that it was the fruit of an illegal seizure.

4. The Government also cites to dicta contained in the *Hodari D.* decision. There, the Court stated:

> To say that an arrest is effected by the slightest application of physical force, despite the arrestee's escape, is not to say that for Fourth Amendment purposes there is a *continuing* arrest during the period of fugitivity. If, for example, [the officer] had laid his hands upon Hodari to arrest him, but Hodari had broken away and had *then* cast away the cocaine, it would hardly be realistic to say that disclosure had been made during the course of an arrest.

*Id.* at 625, 111 S.Ct. 1547 (emphasis in original). This language, at most, relates to where an officer applies a slight touch to a defen-

dant who immediately bolts. Moreover, this language does not stand for the proposition that drugs or firearms initially discovered during an unlawful search and seizure of a citizen are admissible simply because the party escaped from the officer and abandoned the contraband while fleeing. In that situation, the contraband remains the fruit of the unlawful search and seizure. Instead, this dicta merely stands for a more general proposition—a citizen is no longer considered "seized" for Fourth Amendment purposes during periods of fugitivity. As noted by the Supreme Court, the facts involved in *Hodari D.* presented a case one step removed from this scenario. *Id.* Hodari was never physically touched by the officer before he fled, thus a Fourth Amendment seizure never occurred. In fact, the Government has not cited to a single decision in which a court, relying on this dicta, suppressed evidence because a defendant abandoned the evidence while fleeing from the police, after the defendant had been

*Id.* at 629, 111 S.Ct. 1547. As expressed by the Court: "But neither usage nor common-law tradition makes an *attempted* seizure a seizure." *Id.* at 626 n. 2, 111 S.Ct. 1547 (emphasis in original).

As additional support, the Government also analogizes to several Federal Court of Appeals decisions which have applied *Hodari D.,*—decisions holding that momentary compliance with an officers show of authority does not constitute a seizure under the Fourth Amendment. See *United States v. Hernandez,* 27 F.3d 1403 (9th Cir.1994) and *United States v. Valentine,* 232 F.3d 350 (3d Cir.2000).

In *United States v. Hernandez,* 27 F.3d 1403 (9th Cir.1994), the officer announced his presence and stated that he needed to talk to the defendant. *Id.* at 1405. The suspect hesitated for a moment and made direct eye contact with the officer—conduct which the defendant argued constituted submission to the officer's show of authority.[5] *Id.* at 1407. The Court of Appeals for the Ninth Circuit rejected this argument:

> We decline to adopt a rule whereby momentary hesitation and direct eye contact prior to flight constitute submission to a show of authority. Such a rule would encourage suspects to flee after the slightest contact with an officer in order to discard evidence, and yet still maintain Fourth Amendment protections.

*Id.* (citing to *Hodari D.*).

A similar conclusion was reached by the Court of Appeals for the Third Circuit in *United States v. Valentine,* 232 F.3d 350

(3d Cir.2000). In *Valentine,* the defendant, along with two other men, began walking away from two police officers as the officers exited their marked patrol car. *Id.* at 353. The officers ordered the men to stop and requested that the defendant come over and place his hands on the patrol car. *Id.* The defendant responded "Who me?" and ran toward the officers; one of the officers grabbed him and wrestled him to the ground. *Id.* During the scuffle, a fully loaded handgun fell to the ground. *Id.*

The court of appeals rejected the defendant's claim that he was seized when he "momentarily complied" with the officer's order. *Id.* at 359. The court noted that according to *Hodari D.,* "for there to be a seizure, the police must apply physical force to the person being seized or, where force is absent, have the person seized submit to a show of police authority." *Id.* at 358. The court of appeals held that "[e]ven if [the defendant] paused for a few moments and gave his name, he did not submit in an realistic sense to the officer's show of authority, and therefore there was no seizure until [the officer] grabbed him." *Id.* at 359.

#### (ii) Application of *Hodari D.* and its Progeny

The facts of this case are distinguishable from *Hodari D.* and its progeny for several reasons.

First, the seizure of Defendant and the subsequent pat-down search constituted an application of physical force which restrained the liberty of the Defendant. As

---

initially unlawfully seized under the Fourth Amendment.

**5.** In *Hernandez,* the officer also physically touched the defendant by grabbing onto him as he climbed a gate—the defendant, however, escaped and continued to run. The defendant, apparently did not rely on this fact—the

defendant argued that a seizure occurred "despite his subsequent flight, merely because he hesitated for a moment and made direct eye contact with [the officer.]" *Id.* at 1407. Thus, a seizure by application of physical force was not before the court.

noted *supra,* a seizure occurs for Fourth Amendment purposes when physical force is applied by the officers, even when it is ultimately unsuccessful. This rule was made clear in the *Hodari D.* decision. The Court stated:

> To constitute an arrest, however—the quintessential "seizure of the person" under our Fourth Amendment jurisprudence—the mere grasping or application of physical force with lawful authority, whether or not it succeeded in subduing the arrestee, was sufficient.

*Hodari D.,* 499 U.S. at 624, 111 S.Ct. 1547 (citation omitted). The Court went on to state:

> The word "seizure" readily bears the meaning of a laying on of hands or application of physical force to restrain movement, even when it is ultimately unsuccessful. ("She seized the purse-snatcher, but he broke out of her grasp.")
>
> . . . .
>
> There can be no arrest without either touching or submission.

*Id.* at 626–27, 111 S.Ct. 1547 (citations omitted). This distinction, recognized in *Hodari D.*—between the application of physical force and the submission of a citizen to an officer's show of authority—has been recognized by numerous federal courts. *See, e.g., Spiegel v. City of Chicago,* 106 F.3d 209, 211 (7th Cir.1997); *Ludwig v. Anderson,* 54 F.3d 465, 471 (8th Cir.1995); *Bella v. Chamberlain,* 24 F.3d 1251, 1255 (10th Cir.1994); *Lansdown v. Chadwick,* 152 F.Supp.2d 1128, 1148 (W.D.Ark.2000); *Puglise v. Cobb County,* 4 F.Supp.2d 1172, 1178 (N.D.Ga.1998).

In this case, the uncontested testimony[6] reveals that the officers jumped out of the car and ordered the Defendant to put his hands on the front of the car. After Defendant complied with this order, one of the officers spread the Defendant's arms and legs apart and physically frisked the Defendant. During the physical pat-down of Defendant, the firearm was discovered by the officer. Furthermore, the uncontested testimony indicates that the officer actually grabbed the firearm. It was only then, after the Defendant had been ordered to stop, had stopped, had complied with the officer's order to spread-eagle on the car and had been frisked, and after the frisk revealed the weapon at issue (a frisk which, as noted in subsection (iii), was conducted without reasonable suspicion), that Defendant grabbed the gun from the officer and fled.

Clearly, the officer's conduct of ordering the Defendant to the front of his car, spreading the arms and legs of the Defendant, and physically frisking him, whether or not the frisk was one hundred percent complete when the firearm was discovered, constitutes a "seizure" for purposes of the Fourth Amendment. As noted by a Federal District Court for the Southern District of Indiana:

> Seizure by physical force is usually not difficult to assess. An officer may seize a person by direct physical contact—a literal "apprehension." This occurs when a person is closed into a confined area, handcuffed, or when an officer physically touches the person to restrain his or her movement. Other direct physical touching, *like in a pat down search,* is also a seizure.

*United States v. Steele,* 782 F.Supp. 1301, 1308 (S.D.Ind.1992) (emphasis added); *see, e.g., Tom v. Voida,* 963 F.2d 952, 955, 957 (7th Cir.1992) (noting that fleeing defen-

---

6. Again, it must be noted that the Government failed to introduce any evidence as to what transpired during the initial confrontation between Defendant and Officers Reilly and Adams.

dant was seized when the officer physically struggled with the defendant for 25 seconds and attempted to handcuff him, even though he broke free and continued his flight); *Ludwig*, 54 F.3d at 471 (noting that the defendant was seized when an officer intentionally attempted to hit the defendant with his car, when he was shot, and when the officer unsuccessfully applied mace, although the latter action did not violate a clearly established right.)

Furthermore, even if the encounter is characterized as being a mere "show of authority," the Court concludes that the Defendant did in fact submit to the officer's show of authority. Unlike *Hernandez* and *Valentine*, Defendant's submission was not merely "momentary compliance." The defendant's alleged compliance with the officer's orders in *Hernandez* and *Valentine* ended in the blink of an eye—in *Hernandez*, the suspect merely hesitated and made eye contact with the officer; in *Valentine*, the defendant simply alleged that he momentarily stopped as he was walking toward the officer and gave his name. The defendants conduct in both of these cases cannot, in any meaningful sense, be characterized as that of submission to the officer's show of authority.

In contrast, the Defendant in this case clearly submitted to the officer's show of authority. Defendant complied with the officer's order to put his hands on the front of the patrol car. Defendant submitted to the pat-down search of his person. It was only then, during the pat-down search of Defendant, that one of the offi-

cers discovered the firearm in Defendant's wind breaker. At that point, Defendant admits grabbing the gun from the officer and running.

Defendant's submission was not "momentary," nor was this an "attempted" seizure as contemplated by the Supreme Court in *Hodari D.* Defendant submitted to the officer's show of authority in every realistic respect. In fact, Defendant submitted to the officer's show of authority until the firearm was revealed during the pat-down search of Defendant's body, a search in which the officer, as noted below in subsection (iii), lacked reasonable suspicion to conduct.

Accordingly, the Court concludes that the Defendant was "seized" for Fourth Amendment purposes when the officer conducted the pat-down search of Defendant.

### (iii) Reasonable Suspicion

The government argues that, even if Defendant was "seized" when the officers conducted the pat-down search of Defendant, the pat-down search was lawful because an officer may conduct a *Terry* frisk of any person in a "high-crime area" who participates in a consensual encounter with police. The Court, once again, disagrees.

The encounter between the officers and the defendant began as a consensual encounter pursuant to *Florida v. Bostick*, 501 U.S. 429, 434, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991).[7] However, when the officers

---

7. The Supreme Court, in *Florida v. Bostick*, 501 U.S. 429, 434, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991), clarified that mere police questioning does not necessarily constitute a seizure. "Our cases make it clear that a seizure does not occur simply because a police officer approaches an individual and asks a few questions. So long as a reasonable person would feel free to 'disregard the police and go about his business,' the encounter is

consensual and no reasonable suspicion is required." *Id.* The Court went on to state that "when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual, ask to examine the individual's identification, and request consent to search his or her luggage—as long as the police do not convey a message that compliance with their requests is required." *Id.* at 434–35, 111 S.Ct. 2382.

ordered the Defendant to the front of their patrol car and conducted a pat-down search of Defendant, the encounter clearly changed to an investigatory stop governed by *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

"The Fourth Amendment prohibits 'unreasonable searches and seizures' by the Government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest." *United States v. Arvizu*, 534 U.S. 266, 122 S.Ct. 744, 750, 151 L.Ed.2d 740 (2002) (citing *Terry v. Ohio*, 392 U.S. 1, 9, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). In such cases, the Fourth Amendment is satisfied if "the officer's action is supported by reasonable suspicion to believe that criminal activity 'may be afoot.'" *Id.* (quoting *United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989)). "While 'reasonable suspicion' is less a demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop." *Illinois v. Wardlow*, 528 U.S. 119, 123, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000).

Courts must look to the "totality of the circumstances" when making reasonable suspicion determinations to see whether the officer has a " 'particularized and objective basis' for suspecting legal wrongdoing." *Arvizu*, 122 S.Ct. at 750. "This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *Id.* at 750–51. However, mere reliance on a officer's "hunch" is insufficient. *Id.* at 751.

█ The Government asserts that the officers had reasonable suspicion to frisk Defendant because he was in a "high-crime area." However, this Court, like majority of courts that have addressed this issue, concludes that the mere presence of the defendant in a "high-crime area" is insufficient, by itself, to warrant a *Terry* stop and seizure. *Illinois v. Wardlow*, 528 U.S. 119, 124, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000) ("An individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime."); *Brown v. Texas*, 443 U.S. 47, 52, 99 S.Ct. 2637, 61 L.Ed.2d 357 ("The fact that appellant was in a neighborhood frequented by drug users, standing alone, is not a basis for concluding that appellant himself was engaged in criminal activity."); *see also United States v. Christmas*, 222 F.3d 141, 145 (4th Cir.2000); *Diehl v. Munro*, 170 F.Supp.2d 311, 318 (N.D.N.Y.2001).

Consequently, the Court concludes that the officers lacked reasonable suspicion to stop and search the Defendant. The firearm, and the statements made to police concerning the location of the firearm were the fruit of the officers unlawful search and seizure of Defendant. Pursuant to the "fruit of the poisonous tree" doctrine enun-

---

The inquiry whether an encounter was consensual depends on the officer's objective behavior, not any subjective suspicion of criminal activity. *United States v. Waldon*, 206 F.3d 597, 603 (6th Cir.2000). "Absent coercive or intimidating behavior which negates the reasonable belief that compliance is not compelled, the agents request for additional identification and voluntarily given informa-

tion from the defendant does not constitute a seizure under the Fourth Amendment." *United States v. Peters*, 194 F.3d 692, 698 (6th Cir.1999); *see also Bostick*, 501 U.S. at 436, 111 S.Ct. 2382 (asking whether "a reasonable person would feel free to decline the officer's requests or otherwise terminate the encounter").

**780**

ciated by the Supreme Court in *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), this evidence, gathered as a result of the unlawful search and seizure must be suppressed.[8]

## CONCLUSION

For the foregoing reasons, the Court GRANTS Defendant's motion to suppress the firearm and his statements made to the police officers on October 17, 2000.

SO ORDERED.

---

8. Consequently, it is unnecessary for the Court to address whether the public policy safety exception enunciated in *New York v. Quarles*, 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984) applies to Defendant's pre-*Miranda* statements made to the police.