**UNITED STATES of America,
Plaintiff,**

v.

**Laverne SINGLETARY, Defendant.**

**Case No. 13–CR–6065–FPG.**

United States District Court,
W.D. New York.

Signed Aug. 8, 2014.

Charles E. Moynihan, U.S. Attorney's Office, Rochester, NY, for Plaintiff.

Jon P. Getz, Muldoon and Getz, Rochester, NY, for Defendant.

## DECISION & ORDER

FRANK P. GERACI, JR., District Judge.

By text order dated April 30, 2013, this case was referred to United States Magistrate Judge Jonathan W. Feldman, pursuant to 28 U.S.C. §§ 636(b)(1)(A) and (B). Dkt. # 15. The three count indictment in this case alleges that on October 6, 2012, Defendant Laverne Singletary possessed marijuana with the intent to distribute it in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(D), possessed a firearm in furtherance of drug trafficking in violation of 18 U.S.C. § 924(c)(1), and possessed a firearm having previously been convicted of a felony in violation of 18 U.S.C. § 922(g). Dkt. # 14.

Defendant's motion seeks to suppress tangible evidence, namely the marijuana and a gun, that was seized during the events of October 6, 2012. Dkt. # 22. Magistrate Judge Feldman conducted a suppression hearing on October 10 and 11, 2013, where Police Officer Amy Pfeffer and Public Safety Aide Julie Gulino [1] testified. After receiving further submissions from the parties (Dkt. ## 38, 41, 42), Magistrate Judge Feldman issued his Report and Recommendation on May 20, 2014, which recommends granting Defendant's motion to suppress the marijuana and gun that were recovered on October 6, 2012.

---

1. Defendant's motion papers (Dkt. # 26) also seek suppression of the video tape from October 6, 2012, for the alleged failure to record or maintain additional video from that incident. Gulino's testimony was limited to the procedures employed by the Rochester Police Department regarding video recording and retention. Magistrate Judge Feldman recommended the denial of this motion, which Defendant has not objected to. I therefore accept Magistrate Judge Feldman's recommendation regarding the video tape evidence, and the motion to suppress the video tape is DENIED.

Dkt. # 45. On June 18, 2014, the government timely objected to Magistrate Judge Feldman's Report and Recommendation, Dkt. # 52, and the Defendant filed his Memorandum in Support of the Report and Recommendation on June 27, 2014, Dkt. # 54.

Since the government has filed objections, this Court must conduct a *de novo* review as to those portions of the Report and Recommendation to which objections have been made. *See* 28 U.S.C. § 636(b)(1)(C). In doing so, the Court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate." *Id.* As part of this review, the Court has considered all of the parties' submissions to date, as well as the transcripts of the suppression hearing. Based upon that *de novo* review, I find no basis to alter, modify or reject Magistrate Judge Feldman's Report and Recommendation.

The facts regarding the events of October 6, 2012 are drawn from the suppression hearing testimony, and are not in dispute. At about 10:45 that evening, Rochester Police Department Officer Amy Pfeffer and Monroe County Probation Officer Robert Masucci were driving on Roth Street in the City of Rochester. They observed the Defendant walking down a public sidewalk, where Officer Pfeffer acknowledges he was not doing anything suspicious. As the officers got closer to the Defendant, Pfeffer observed "a container" that was "a standard size of a beer" that was covered by a "brown paper bag." Pfeffer testified that she "had no idea" what was under the brown paper bag, but that in her experience, brown paper bags are used to cover up alcoholic beverages. Pfeffer further testified that she would have used a spotlight to illuminate anyone on the street because it was a high violence area.

Based upon her observation of a man walking on a public sidewalk with a can sized object covered by a brown paper bag, Pfeffer directed Masucci to stop the Defendant. Pfeffer testified that it was the paper bag that gave her a reason to have the Defendant stopped. The officers stopped their car, and approached the Defendant on foot. Pfeffer testified that even at the time the officers approached the Defendant, she did not know what was in the Defendants' hand, and further testified that the Defendant did not drink from the object, or do anything else that would raise their suspicion.

Pfeffer ordered the Defendant to stop. Defendant replied, "Who me?" and walked away from the officers. Masucci then reached out in an effort to stop the Defendant, by placing his right hand on the Defendant's right shoulder. The Defendant then "threw the can behind him and then he pushed Officer Masucci's hand off of him and then proceeded to run." The can spilled on Pfeffer, who now, for the first time, could smell beer. The officers gave chase, and a short time later, the Defendant lost his footing on some rocks, and both the officers and the Defendant fell to the ground. The Defendant was taken into custody, and the officers recovered a handgun from the ground where the Defendant had fallen. The Defendant was then searched, and the officers recovered thirteen bags of marijuana from a pocket in the Defendant's hoodie.

There are two separate determinations made by Magistrate Judge Feldman that the government objects to. First, Magistrate Judge Feldman found that the initial stop and seizure of the Defendant was not supported by reasonable suspicion, and was therefore improper. Second, Magistrate Judge Feldman found that the evidence seized as a result of the illegal stop

should be suppressed under the exclusionary rule.

■ Turning first to the issue of reasonable suspicion, it is well settled that law enforcement may briefly seize an individual if that officer has "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417–18, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981); *see also Terry v. Ohio*, 392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). A mere hunch is insufficient to create reasonable suspicion, *Terry*, 392 U.S. at 27, 88 S.Ct. 1868, nor can a stop be based upon "inchoate suspicion." *United States v. Bayless*, 201 F.3d 116, 132–33 (2d Cir.2000) (internal quotation omitted). At the same time, reasonable suspicion depends on "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Ornelas v. United States*, 517 U.S. 690, 695, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996). In the end, courts "look at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002).

In this case, I agree with Magistrate Judge Feldman that there was insufficient information to form a reasonable belief that criminal activity was afoot, and therefore, the initial stop of the Defendant was illegal. To be sure, the officers in this situation guessed correctly, in that they were able to later confirm that Defendant was indeed carrying an open container of beer in public. However, the stop was initially based upon nothing more than a hunch. The government argues that the observation of an individual on a public street with a can sized object covered by a paper bag, which an officer believes to be

alcohol based on their training and experience, is sufficient to establish reasonable suspicion. Notably, the government has not cited any cases wherein those facts were found to establish reasonable suspicion to detain an individual, nor am I aware of any. To the contrary, I find such facts to simply establish a hunch, rather than reasonable suspicion which could justify a brief investigatory detention. While the officers could have attempted to speak with the Defendant and perhaps verify their hunch—after which they could have had a sufficient basis to detain the Defendant—they chose to detain him first, without sufficient justification. That stop— where the officer placed his hand on the Defendant's shoulder—is undoubtedly a seizure of the Defendant. *See California v. Hodari D.*, 499 U.S. 621, 624, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991) ("the mere grasping or application of physical force with lawful authority, whether or not it succeeded in subduing the suspect" is sufficient for a seizure.)

■ The government's second objection is to Magistrate Judge Feldman's finding that the evidence derived from the initial seizure should be suppressed. As Magistrate Judge Feldman pointed out, although the initial stop of the Defendant has been found to be unjustified, the analysis does not end there. Rather, the question is whether the evidence recovered is tainted by the illegal detention, or whether a separate intervening act provides a legitimate basis for the recovery of the evidence. While I won't restate Magistrate Judge Feldman's discussion of Justice Scalia's *dicta* in *Hodari D.* and the timing of the events that took place in this case, I agree with his analysis. While, like *Hodari D.*, this is a case where the officers illegally directed an individual to stop and the individual refused to comply, the distinguishing factor is that the officers here

actually *seized* the Defendant by using force, and *after* the illegal seizure, the challenged evidence was obtained. It was not until *after* the officers seized the Defendant that he spilled the container of beer, after which the Defendant subsequently broke free from the officers and ran. On the other hand, *Hodari D.* "[did] not involve the application of any physical force; Hodari was untouched by [the officer] at the time he discarded the cocaine." *Hodari D.*, 499 U.S. at 625, 111 S.Ct. 1547. It is also well settled that a defendant's flight alone does not justify the seizure of a defendant. *United States v. Sharpe*, 470 U.S. 675, 706, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985) ("Of course, flight alone cannot give rise to probable cause; it must be coupled with pre-existing reasonable and articulable suspicion.") (citation omitted).

In many ways, the government's argument to save the illegally obtained evidence creates a no-win scenario for the Defendant: if he does not yield to an illegal detention, the officers can then stop him for avoiding that original detention, and the initial reasonable suspicion determination—a well rooted and established principle of our jurisprudence—is made irrelevant. Or in other words,

> If we accepted the government's argument that such a simple refusal to comply could create reasonable suspicion where none existed before, we would create a truly paradoxical class of individuals: individuals who cannot be stopped by officers, but who can be stopped if they refuse to stop. Such a conclusion would gut the Court's repeated determination that an individual approached by the police "need not answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way. He may not be detained *even momentarily* without reasonable, objective grounds for doing so; and his refusal to listen or an-

swer does not, without more, furnish those grounds." *Florida v. Royer*, 460 U.S. 491, 497–98, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (plurality opinion) (emphasis added) (internal citations omitted); *see also Wardlow*, 528 U.S. at 125, 120 S.Ct. 673. The "more" contemplated by *Royer*, sufficient to give rise to reasonable suspicion, does not exist in this case.

*United States v. Freeman*, 735 F.3d 92, 102–3 (2d Cir.2013).

The firearm and the marijuana in this case were recovered because of an illegal seizure that taints their recovery, and are therefore fruits of the poisonous tree that must be suppressed. Based on the foregoing, the Court accepts and adopts the Report and Recommendation filed by United States Magistrate Judge Jonathan W. Feldman (Dkt. # 45) in its entirety, and Defendant's motion to suppress evidence, namely the firearm and marijuana recovered on October 6, 2012, (Dkt. # 22) is GRANTED.

IT IS SO ORDERED.

## REPORT AND RECOMMENDATION

JONATHAN W. FELDMAN, United States Magistrate Judge.

### *Preliminary Statement*

The issue before the Court is whether an individual walking alone on a public sidewalk during the evening hours, holding in one hand an unidentified object covered by a small brown paper bag, is sufficient evidence that "criminal activity may be afoot" so as to justify a forcible seizure of that individual pursuant to° *Terry v. Ohio*, 392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Because I find that such behavior does not give reasonable suspicion to justify a "*Terry* stop," it is my Report

and Recommendation that the defendant's motion to suppress be granted.

### Procedural Background

On April 30, 2013, defendant Laverne Singletary was indicted on three counts of possession of marijuana with intent to distribute, possession of a firearm in furtherance of a drug trafficking crime, and a felon in possession of a firearm. *See* Indictment (Docket # 14). Currently before the Court is a motion by the defendant to suppress statements and tangible evidence obtained during an October 6, 2012 stop, arrest, and search of the defendant. (Docket # 22). The defendant also seeks suppression of evidence based on the destruction of video surveillance. *Id.* The Government has filed papers in opposition to the motion. (Docket # 23).

A suppression hearing was held on October 10–11, 2013,[1] after which both the Government and defense counsel filed supplemental briefs. By Order of Judge Frank P. Geraci, Jr., dated April 30, 2013, all pretrial motions have been referred to this Court pursuant to 28 U.S.C. §§ 636(b)(1)(A)–(B). (Docket # 15).

### Facts

The testimony adduced at the suppression hearing revealed that on October 6, 2012, Rochester Police Department ("RPD") Officer Amy Pfeffer was working the "Night Watch," a law enforcement detail in which local probation officers assist members of the Rochester Police Department with their street crime investigations as they patrol the City in marked police vehicles. Tr. 9–10. Officer Pfeffer's "partner" that evening was Monroe County Department of Probation Officer Robert Masucci. *Id.* At approximately 10:45 p.m., Officer Pfeffer and Probation Officer Masucci were driving southbound on Roth Street toward Flower Street in the city of Rochester, New York, when they observed an individual, later identified as the defendant Laverne Singletary (hereinafter. "Singletary" or defendant), walking down a public sidewalk on the west side of the street. Tr. 10–12. Officer Pfeffer was driving, and Probation Officer Masucci was in the passenger seat of the police vehicle. Tr. 12. Singletary was facing towards the police vehicle as it approached. *Id.* Officer Pfeffer first noticed Singletary from a distance of approximately ten car lengths. Tr. 13. He was alone and, according to Officer Pfeffer, was doing nothing suspicious when she first observed him. Tr. 66, 78. However, as the police vehicle got closer to Singletary, Officer Pfeffer claims she observed Singletary holding an object in his right hand. Tr. 12–13.

The object was described by Officer Pfeffer in varying degrees of detail. In the police report Officer Pfeffer prepared after Singletary's arrest, she stated that she "observed" Singletary walking northbound of Roth Street "with an open container of Bud Ice 24 Oz beer in his hand." *See* Defense Exhibit "M." Officer Pfeffer made no mention of a brown bag covering a beer can in her police report. In fact, on direct examination at the suppression hearing, Officer Pfeffer testified that she was unable to see what was in the can, only that she saw Singletary holding in his right hand "a container" covered by a "brown paper bag." Tr. 12–13. Officer Pfeffer described the container as about as big as "a standard size of a beer," but, unlike the detail in her police report, testified she was unable to tell what kind of can it was. *Id.* On cross examination Officer Pfeffer testified that it was not until she pointed a vehicle mounted spotlight on Singletary that she observed him holding any-

---

**1.** Citations to the hearing transcript of October 10 are referred to as "Tr.", and citations to the hearing transcript of October 11 are referred to as "Tr. B".

thing in his hand. Tr. 67–68. On direct examination Officer Pfeffer testified that Singletary was "[o]nly a couple feet away" when she "first placed my spotlight on him." Tr. 14. On cross examination, Officer Pfeffer stated that she was twenty feet from Singletary when she first used the spotlight and that she "wouldn't have seen" the brown bag without the aid of the spotlight. Tr. 68, 70. Officer Pfeffer stated that when she first observed Singletary she "had no idea" what was beneath the paper bag, but that in her experience brown paper bags are "covering up alcoholic beverages." Tr. 17, 77–78. Officer Pfeffer testified that she would have used the spotlight to illuminate anyone on the street that evening because the neighborhood was "a high violence area and I'm always interested to see who is down there." Tr. 68.

After observing the brown paper bag in Singletary's hand, Officer Pfeffer told Probation Officer Masucci, "[S]top that guy. He has an open container." Tr. 67. Probation Officer Masucci pulled the police vehicle up next to Singletary and both officers exited the car. Tr. 14. Even as she approached the defendant on foot, Officer Pfeffer did not know what Singletary was holding in his hand. Tr. 17. During the time she was watching the defendant on Roth Street, Officer Pfeffer agreed that she never observed Singletary raise the brown bag to his mouth to take a drink. Tr. 73. She did not see Singletary stumble, yell, or cause any kind of disturbance. Tr. 78. Officer Pfeffer testified that it was the paper bag that gave her a reason to direct Probation Officer Masucci to stop the defendant. Tr. 77–78.

Upon exiting the police car, Officer Pfeffer faced Singletary and ordered him to "stop." Tr. 14. Officer Pfeffer stated that Singletary replied, "Who me?" and began walking away from Officer Pfeffer. Tr. 14,

16. Probation Officer Masucci, who had then positioned himself in front of Singletary, attempted to stop the defendant by reaching out and placing his hand on the "right shoulder area" of Singletary. Tr. 16. At this point, Singletary "threw the can behind him and then he pushed Officer Masucci's hand off of him and then proceeded to run." Tr. 17. A potion of the can's contents spilled on Officer Pfeffer, and she testified that she immediately smelled beer on her clothing. Tr. 18. Both Probation Officer Masucci and Officer Pfeffer gave chase. Tr. 19. As Officer Pfeffer was about to tackle Singletary in the front yard of 86 Roth Street, she looked down to make sure there was no debris on the ground. *Id.* Singletary lost his footing on some rocks, and Officer Pfeffer recalled that she, Probation Officer Masucci, and the defendant all fell to the ground at the same time. Tr. 20. Officer Pfeffer testified that Singletary was struggling as she attempted to get his hands behind his back and place handcuffs on them. *Id.* Once the handcuffs were in place, Officer Pfeffer and Probation Officer Masucci lifted the defendant off the ground, and Officer Pfeffer observed "a Browning handgun located where the area of the struggle was." Tr. 21. Singletary was placed under arrest and was searched. Tr. 22–23. In Singletary's "front hoodie pocket," Officer Pfeffer found thirteen bags of marijuana. Tr. 24–25. The defendant was then transported to the Monroe County Jail. Tr. 60–61.

Sometime after the arrest of the defendant, Officer Pfeffer and Probation Officer Masucci visited RPD's "camera room" to ascertain whether a pole camera on Roth Street captured any part of their encounter with Singletary. Tr. 29, 49. After reviewing some video footage that showed part of the incident, Officer Pfeffer filled out a "burn request form" asking for a copy of the footage to be burned to a DVD.

*Id.* Julie Gulino, a public safety aide with RPD, testified that in October 2012 she received a written "burn request form" from Officer Pfeffer. Tr. B 6–7. The request form described the date of the incident, the time of the video being requested, and general information describing the incident. *Id.* Ms. Gulino confirmed that she made a copy of the pole camera footage requested by Officer Pfeffer, and thereafter she provided the DVD to Officer Pfeffer. Tr. B 9–12. A copy of the DVD was received in evidence at the suppression hearing and was viewed by the Court both during and after the hearing. *See* Government Exhibit "1."

### Discussion

A. *The Terry Stop of Singletary:* The legality of Officer Pfeffer's initial actions towards Singletary must be evaluated pursuant to *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). In *Terry,* the Supreme Court held that a police officer may briefly seize someone if the officer reasonably suspects the person of being involved in criminal activity. *Id.* at 30, 88 S.Ct. 1868. Two *Terry* related issues arise immediately: (1) Did Officer Pfeffer's initial contact with Singletary constitute a seizure under the Fourth Amendment?, and (2) If Singletary was seized, did Officer Pfeffer have "a reasonable, articulable suspicion that criminal activity [was] afoot"? *See Illinois v. Wardlow,* 528 U.S. 119, 123, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000) (*citing Terry,* 392 U.S. at 30, 88 S.Ct. 1868).

■■■ *1. Was There a Seizure?:* The Fourth Amendment applies only to "searches and seizures" within the meaning of the Constitution. It follows that if Singletary was not initially seized, there was no Fourth Amendment violation. *California v. Hodari D.,* 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991), provides guidance on defining a seizure under the Fourth Amendment. In *Hodari D.,* the defendant discarded a small rock of crack cocaine while fleeing from officers. *Id.* at 623, 111 S.Ct. 1547. The State conceded that the officers lacked reasonable suspicion to stop the defendant, so the critical issue for the Court was whether the defendant was "seized" for Fourth Amendment purposes when he saw the officers rushing towards him. *Id.* The Supreme Court held that a seizure of an individual occurs only when one actually submits to an assertion of authority by the police or when physical force is applied in order to restrain someone. *Id.* at 624–25, 111 S.Ct. 1547. Particularly significant to the present case was the Court's holding in *Hodari D.* that a seizure occurs even when the application of physical force is "ultimately unsuccessful." *Id.* at 626, 111 S.Ct. 1547. Applying *Hodari D.* to the incident at issue here, the mere fact that Singletary initially escaped Probation Officer Masucci's grasp by pushing his hand away is of no significance for Fourth Amendment purposes. As the Court stated in *Hodari D.,* "the mere grasping or application of physical force with lawful authority, whether or not it succeeded in subduing" the suspect, is sufficient for a seizure. *Id.* at 624, 111 S.Ct. 1547, The moment Probation Officer Masucci put his hands on Singletary's right shoulder, a seizure occurred, and the officers' actions must be measured under the Fourth Amendment.[2]

*2. Was There Reasonable Suspicion of Criminal Activity?:* In *Terry v. Ohio,* the Supreme Court reiterated that "[n]o right

---

**2.** Because I find that Singletary had not been seized until Probation Officer Masucci grabbed his shoulder, any claim that his pre-stop statement to Officer Pfeffer ("Who me?") must be suppressed because he was in custody and entitled to *Miranda* warnings is without merit.

is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law." *Terry,* 392 U.S. at 9, 88 S.Ct. 1868 (*quoting Union Pac. Ry. Co. v. Botsford,* 141 U.S. 250, 251, 11 S.Ct. 1000, 35 L.Ed. 734 (1891)). The grounds for a *Terry* stop "must exist at the time of the seizure." *United States v. Simmons,* 560 F.3d 98, 107 (2d Cir.2009). Moreover, "[t]he suspicion that criminal activity is afoot must be both reasonable and articulable, and an inchoate and unparticularized suspicion or hunch of criminal activity is insufficient to justify even a brief detention for the purpose of investigation." *United States v. Muhammad,* 463 F.3d 115, 121 (2d Cir. 2006) (internal quotation marks and citation omitted). "Based upon [the] whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez,* 449 U.S. 411, 417, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981).

Based on the "whole picture" as testified to by Officer Pfeffer, I find that the initial seizure of Singletary was not supported by an objective and particularized basis that would reasonably allow one to suspect that Singletary was engaging in criminal activity. Singletary was walking down a public sidewalk carrying an object that Officer Pfeffer thought might be a container holding a liquid. Tr. 12–13. The container itself was obscured by a brown paper bag. *Id.* The officers had received no reports of illegal behavior or suspicious activity in that area prior to the seizure of the defendant. Tr. 68. There was no evidence or suggestion of facts that might be consistent with the public consumption of an alcoholic beverage, such as a party or boisterous, loud, or unruly behavior. Contrary to the description contained in her police report, Officer Pfeffer testified she never observed Singletary carrying a can of any kind, let alone an open container filled with an alcoholic beverage. Tr. 17. Officer Pfeffer never observed Singletary stagger, stumble, or sway. Tr. 78. Officer Pfeffer never saw Singletary do anything or say anything to suggest he had been drinking. Indeed, despite watching Singletary closely both before and after turning the spotlight on him, Officer Pfeffer never saw Singletary raise the object he was carrying anywhere near his mouth. Tr. 73.

The defendant's refusal to cooperate with Officer Pfeffer's direction to stop is also not objective evidence that Singletary was engaging in criminal activity. "An individual approached by an officer who has no reasonable suspicion of wrongdoing may ignore the officer and go about his business, and his refusal to cooperate may not form the basis for his detention." *Muhammad,* 463 F.3d at 123. *See also United States v. Goines,* 604 F.Supp.2d 533, 542 (E.D.N.Y.2009) ("The bare fact that [defendant] tried to leave the scene cannot create reasonable suspicion"). Officer Pfeffer's testimony that it was after dark and Singletary was walking in a "high violence area" does not elevate Singletary's behavior into a reasonable belief of criminal activity. Of course, "[a]n individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime." *Wardlow,* 528 U.S. at 124, 120 S.Ct. 673. While Officer Pfeffer characterized the location as "high violence," her decision to stop Singletary was not because of any evidence of suspected violence but was based solely on the fact that she surmised an object obscured by a brown paper bag was an open can of beer. As to the time of day, the stop here did not

occur in the wee hours of the morning but at 10:45 in the evening—hardly a time when one would find walking down a public sidewalk particularly suspicious behavior.

I credit Officer Pfeffer's testimony that she would have used the spotlight to illuminate anyone on the street that evening because the neighborhood was "a high violence area and I'm always interested to see who is down there." Tr. 68. However, being "interested in who is down there," no matter how well intentioned, does not permit seizures that do not conform fully to the Fourth Amendment. Ultimately it was the existence of the brown paper bag that made Officer Pfeffer suspect that (1) what Singletary was holding was a beverage container, (2) that the beverage container currently held an alcoholic beverage, and (3) that the container was not only open but also not empty. My finding is not that Officer Pfeffer had no reason to think that Singletary was walking down Roth Street carrying a can of beer covered by a brown paper bag. In fact, I have no reason to doubt that she did. However, based on the facts presented at the suppression hearing, I conclude that Officer Pfeffer's suspicion of criminal activity could only reasonably rise to the level of a "hunch," and a "hunch of criminal activity is insufficient to justify even a brief detention for the purpose of investigation." *Muhammad,* 463 F.3d at 121 (*citing Terry,* 392 U.S. at 27, 88 S.Ct. 1868). *See also United States v. Swindle,* 407 F.3d 562, 569 (2d Cir.2005) ("The officers certainly may have suspected [the defendant of criminal behavior], but the relevant question is whether that suspicion was reasonable."). In this case, Officer Pfeffer's *Terry* stop of the defendant was not supported by reasonable suspicion that criminal activity was afoot.

**B. The Second Seizure of Singletary:** Having determined that the initial stop of Singletary violated his Fourth Amendment right to be free from an unreasonable seizure, it would be reasonable to assume that any evidence derived from the improper *Terry* stop should be suppressed. However, dicta contained in the Supreme Court's *Hodari D.* decision has complicated the "fruit of the poisonous tree" analysis in cases where the incident extends beyond the initial seizure. In *Hodari D.,* Justice Scalia posed a hypothetical "example" of behavior that might purge the taint of an illegal seizure.

> To say that an arrest is effected by the slightest application of physical force, despite the arrestee's escape, is not to say that for Fourth Amendment purposes there is a continuing arrest during the period of fugitivity. If, for example, [the officer] had laid his hands upon Hodari to arrest him, but Hodari had broken away *and had then* cast away the cocaine, it would hardly be realistic to say that that disclosure had been made during the course of an arrest.

*Hodari D.,* 499 U.S. at 625, 111 S.Ct. 1547 (emphasis added). Under Justice Scalia's example, even if an initial seizure violates the Fourth Amendment, the suspect's attempt at escape renders the initial illegality irrelevant, and the police are given the benefit of a "clean slate" in evaluating their conduct during the period of "fugitivity." *Id.*

Although dicta, a number of federal and state courts have found the analysis quoted above to be persuasive when evaluating police conduct occurring after an illegal seizure. *See, e.g., United States v. Hickson,* No. 4:13–cr–24(CDL), 2014 WL 583005, at *4 (M.D.Ga. Feb. 13, 2014) ("[E]ven if one accepts the argument that the Defendant in the present case was seized when the officer touched him during

his flight, it also follows that each time the Defendant broke free from the officer's touch and continued his flight, he was not under arrest until he was touched again."); *United States v. Williams,* 608 F.Supp.2d 325, 330 (E.D.N.Y.2008) ("By breaking free of the [officer's] grasp, [the defendant] rendered the legality of that seizure an irrelevancy"); *People v. Henderson,* 370 Ill.Dec. 804, 989 N.E.2d 192, 203 (2013) (collecting cases) (finding that defendant's flight interrupted the causal connection between the officer's misconduct and the subsequent disclosure of contraband by the defendant during flight); *Johnson v. State,* 689 So.2d 376, 378 (Fla.Dist.Ct.App. 1997) ("[E]ven if appellant is deemed to have initially been seized by the police, his subsequent flight and contemporaneous tossing was a revocation of his submission so as to bring the tossing of the gun outside the temporal scope of the seizure."). *See also United States v. Castillo,* 238 F.3d 424, 2000 WL 1800481, at *6 (6th Cir. Nov. 28, 2000) (unpublished table decision) (concluding that a suspect's fleeing an unlawful detention "constituted an intervening act that purged the taint of his detention"); *Ludwig v. Anderson,* 54 F.3d 465, 471 (8th Cir.1995) ("*Hodari D.* instructs that many different seizures may occur during a single series of events.").[3]

Applying this analysis to Singletary's encounter with law enforcement on October 6, 2012, however, does not alter the Court's view that the defendant's suppression motion should be granted. According to Officer Pfeffer's testimony, Singletary spilled beer on her *before* he was able to break free of Probation Officer Masucci's grasp. In her sworn testimony to the Court, Officer Pfeffer described the sequence of events as follows: "The defen-

dant threw the can behind him and *then* he pushed Officer Masucci's hand off of him and *then* proceeded to run." Tr. 17 (emphasis added). A review of the surveillance video footage, although dark and blurry, appeared consistent with Officer Pfeffer's testimony. *See* Government Exhibit "1." Thus, while Officer Pfeffer was now able to confirm her hunch that the substance in the container was in fact alcohol, that confirmation took place *during and not after* the initial seizure of the defendant. *See, e.g., United States v. Parker,* 214 F.Supp.2d 770, 779 (E.D.Mich. 2002) (suppressing evidence obtained as a result of an illegal *Terry* stop as "fruit of the poisonous tree," despite defendant's flight after illegal seizure).

This Court recognizes that "[t]he concept of reasonable suspicion ... is not readily, or even usefully, reduced to a neat set of legal rules." *United States v. Sokolow,* 490 U.S. 1, 7–8, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989). Instead, the Court must determine whether reasonable suspicion exists by considering "the totality of the circumstances." *Id.* Officer Pfeffer's testimony made clear that nothing happened during the period of Singletary's fugitivity, aside from his flight, that would have provided a new, independent basis to chase, tackle, and search him. In *Illinois v. Wardlow,* the Supreme Court rejected a per se rule that flight alone gave reasonable suspicion to justify a stop. *See Wardlow,* 528 U.S. at 125–26, 120 S.Ct. 673. Instead, flight is only one consideration in "the totality of the circumstances" analysis. *Id.* Based on the totality of the circumstances in this case, Officer Pfeffer did not have reasonable suspicion to justify a second *Terry* stop of the defendant.

---

**3.** The impact of applying this dicta has been criticized by the Second Circuit in an analogous holding. *See United States v. Baldwin,* 496 F.3d 215, 220 (2d Cir.2007) ("We ac-

knowledge that this rule could create an incentive for the police to issue unreasonable orders to stop in the hopes of creating reasonable suspicion or probable cause.").

■ It is well established that "[a]ny evidence seized based upon an illegal stop is subject to the fruit of the poisonous tree doctrine, and may be suppressed." *United States v. Scopo*, 19 F.3d 777, 781 (2d Cir. 1994) (internal quotation marks removed). In determining whether to suppress the Browning handgun and marijuana seized during on October 6, 2012, this Court must consider "whether, granting establishment of the primary illegality, the evidence to which the instant objection is made" was obtained "by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun v. United States*, 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). I find that the weapon and marijuana were obtained "by exploitation of" an illegal seizure, and the evidence is the fruit of that illegality. For this reason, it is my Report and Recommendation that the defendant's motion to suppress the weapon found during the second seizure and the marijuana seized during the search incident to the arrest should be **granted.**

*C. The Destruction of Video Surveillance Evidence:* The defendant also argues that video surveillance footage of the October 6, 2012 incident must be suppressed based on the government's failure to preserve a greater portion of the pole camera video. Because the defendant has failed to present any evidence that the government acted in bad faith, it is my Report and Recommendation that the motion be **denied.** *See Arizona v. Youngblood*, 488 U.S. 51, 58, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988) ("[U]nless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially

useful evidence does not constitute a denial of due process of law.").

### Conclusion

For the foregoing reasons, it is my Report and Recommendation that defendant's motion to suppress the tangible evidence obtained during the October 6, 2012 stop, arrest, and search (Docket # 22) be **granted,** and that defendant's motion to suppress statements and video surveillance evidence be **denied.**

**SO ORDERED.**

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED,** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report and Recommendation in accordance with the above statute and Rule 59(b)(2) of the Local Rules of Criminal Procedure for the Western District of New York.[4]

The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. *See, e.g., Paterson–Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir.1988).

*Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order. Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88

4. Counsel is advised that a new period of excludable time pursuant to 18 U.S.C. § 3161(h)(1)(D) commences with the filing of this Report and Recommendation. Such period of excludable delay lasts only until objec-

tions to this Report and Recommendation are filed or until the fourteen days allowed for filing objections has elapsed. *United States v. Andress*, 943 F.2d 622 (6th Cir.1991); *United States v. Long*, 900 F.2d 1270 (8th Cir.1990).

L.Ed.2d 435 (1985); *Wesolek v. Canadair Ltd., et al.,* 838 F.2d 55 (2d Cir.1988).

The parties are reminded that, pursuant to Rule 59(b)(2) of the Local Rules of Criminal Procedure for the Western District of New York, "[w]ritten objections ... shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection, and shall be supported by legal authority." *Failure to comply with the provisions of Rule 59(b)(2) may result in the District Court's refusal to consider the objection.*

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the Plaintiff and the Defendant.

**SO ORDERED.**

Dated: May 20, 2014.